## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA
## JOHNSTOWN DIVISION

SONYA TAYLOR, Administratrix of    :
The Estate of Devin J. Taylor, and in    :
Her own Right,    :      Civil Action No. 05-350J
   :
   :
        Plaintiff,    :
   :
        vs.    :
   :
ALTOONA AREA SCHOOL DISTRICT,    :
ALTOONA AREA SCHOOL BOARD,    :
SUZANNE RITCHEY, CAROL MYERS,    :
MICHELLE ADAMS, R.N.,    :
   :
        Defendants.    :      JURY TRIAL DEMANDED

### AMENDED COMPLAINT

*A.*    *Introduction*

1.    This is a civil rights action brought on behalf of the Estate of Devin J. Taylor ("DJ"), by and through the Administratrix of the Estate and his natural mother, Sonya Taylor ("Taylor"), and in her own right. This action is brought under the Civil Rights Act of 1871, 42 U.S.C. Section 1983 (Section 1983); the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. Section 1400, *et seq.*; the Rehabilitation Act of 1973, 29 U.S.C. Section 794 (Rehabilitation Act); the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. Section 12101, *et seq.* This action is also brought for violations of the Plaintiffs' respective rights afforded them under the United States Constitution, including but not necessarily limited to the Eleventh and Fourteenth Amendments. Plaintiffs have also brought this action seeking redress under Pennsylvania state law pursuant to which this Court may exercise pendent jurisdiction.

2.      These claims are made against the Altoona Area School District, the Principal of Wright Elementary School, the school nurse and the child's third grade teacher.   Plaintiffs seek compensatory damages from all of these Defendants, and punitive damages from the individual Defendants for violation of the Constitutional rights and federal laws that protect constitutional and statutory rights of individuals with disabilities; provide for an identified child with a recognized disability access to a free appropriate public education; protect against infringement upon the child's right to be free from discrimination based upon a disability; and, protect against the deprivation of constitutionally protected interests, among them life, liberty and education without due process of law.

3.      The IDEA requires all states and school districts to "identify, locate and evaluate" all children with disabilities ("child find"), and to provide these children with special education services, including specialized instruction and related services. Children with asthma, breathing problems, or other physical health problems are among those who may qualify for either special education under IDEA or reasonable accommodations under Section 504 of the Rehabilitation Act of 1973 ("Section 504").

4.      The ADA prohibits discrimination against individuals with a recognized disability.    Pertinent to the within claims, the ADA requires that reasonable accommodations be provided relative to the disability to insure that a child is afforded a free and appropriate public education.

5.      In connection therewith, DJ was identified as a disabled child and/or an identified child within the meaning of the statutory provisions.  DJ suffered from severe asthma, a disability or condition known by these Defendants.

6.      Section 1983 provides for a cause of action when a person acting under color of state authority violates federal law or the United States Constitution, thereby depriving another individual of rights protected or guaranteed thereby.

B.      *Jurisdiction*

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. Sections 1331 and 1343.  Plaintiffs' cause of action arises under 20 U.S.C. Section 1400, *et seq.*, as amended; 29 U.S.C. Section 794; 42 U.S.C. Section 12101, *et seq.*; and 42 U.S.C. Section 1983.  Venue in the Western District of Pennsylvania is proper under 28 U.S.C. Section 1391(b), because Plaintiffs reside in Blair County where the District and its schools are located.

C.      *Parties*

8.      Devin J. Taylor ("DJ") was born on October 12, 1994.  At all times relevant hereto, DJ was a student at Wright Elementary School within the Altoona Area School District.

9.      Sonya Taylor ("Taylor") is DJ's natural mother and served as his primary physical and legal custodian.  Taylor is also Administratrix of the Estate of Devin J. Taylor.  She and DJ at all times relevant hereto resided in Altoona, Blair County, Pennsylvania, within the area served by Altoona Area School District.

10.     Altoona Area School District ("District") is the local education agency within the meaning of IDEA.  Defendant Altoona Area School District, as a recipient of federal funds under IDEA and other programs of federal financial assistance, is prohibited from discriminating against individuals with disabilities.  The Defendant Altoona Area School District is responsible for affirmatively making reasonable

3

accommodations and providing benefits to students with disabilities that are as effective as those provided to non-disabled students, including but not limited to related medical services.

11.    Suzanne Ritchey ("Defendant Ritchey") was employed by Defendant Altoona Area School District as the Principal of Wright Elementary School at all times relevant hereto.

12.    Michelle Adams, RN, CSN ("Defendant Adams"), was employed by Defendant Altoona Area School District as a school nurse for the Altoona Area School District at all times relevant hereto.

13.    Carol Myers ("Defendant Myers") was employed by Defendant Altoona Area School District as a teacher at Wright Elementary School at all times relevant hereto.  In said capacity, Defendant Myers was DJ's third grade teacher at the time of his death.

14.    All individual Defendants are sued in their personal capacity.  Actions or omissions of the individual Defendants in their official capacities are included in the claims against the District and Board.

D.    *Legal Background*

15.    Under IDEA and relevant implementing regulations, each state and each local educational agency (such as a school district) within a state, is required to identify, locate and evaluate every child with a disability.

16.    "Disabilities," as defined by IDEA, include not only enumerated specific learning disabilities, but also includes various mental, emotional and physical

impairments. Asthma and other breathing problems are examples of recognized disabilities within the ambit of IDEA.

17. IDEA further requires that states and local education agencies ensure that each child with disabilities is provided a free appropriate public education (FAPE). A FAPE consists of special education and related services designed to meet the child's unique needs.

18. The obligation of school districts and the state to identify and provide appropriate educational services to children with disabilities also arises in connection with Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. Section 794 ("Section 504"), and regulations promulgated thereunder.

19. Section 504 bars all federally funded entities, including but not limited to school districts that receive federal funds, from discriminating on the basis of disability.

20. Similarly, the ADA provides that "no qualified individual with a disability shall by reason of such disability be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity," as set forth in 42 U.S.C. Section 12132.

21. The Fourteenth Amendment to the United States Constitution forbids a state from depriving any person of life, liberty or property without due process of law. Protected interests in property are normally not created by the United States Constitution, but rather are created and defined by an independent source (e.g. federal or state statute).

22. Title 42 U.S.C. Section 1983 protects individuals from violations of rights protected by the Constitution or laws of the United States that was committed by a person acting under the color of state authority.

23.     In connection with that herein set forth, this action is brought seeking redress for violations of the IDEA, the Rehabilitation Act, the ADA and regulations promulgated thereunder. Plaintiff also brings this action pursuant to Section 1983 for violations of federal law while acting under the color of state authority.

24.     In addition thereto, this action is brought under Section 1983, seeking redress for violations of constitutionally protected interests and rights. In particular, the circumstances giving rise to the instant action have deprived DJ of substantive rights protected by the Fourteenth Amendment, including life and liberty. DJ's substantive right to due process was also violated by actions that deprived him of the constitutionally protected right to a free, public education. Taylor seeks redress for violations of her Fourteenth Amendment rights, insofar as she has been deprived of the constitutionally protected interests associated with the parent-child relationship for violations of federal law and the decedent's constitutionally protected interests.

25.     Plaintiffs bring this action seeking redress pursuant to Pennsylvania state law claims under the Pennsylvania Wrongful Death and Survival statutes.

26.     Matters contained herein are pled jointly and in the alternative.

E.     *Facts*

27.     The averments set forth elsewhere in this Complaint are incorporated herein by reference.

28.     At all times relevant hereto, DJ was identified, recognized and known to be a student with disabilities (i.e. asthma and/or related breathing problems) within the meaning of the statutory provisions and attendant regulations.

6

29.    In connection therewith, the Defendants and Taylor participated in the development of an Individualized Education Plan (IEP) addressing issues pertinent to the child's disabilities.

30.    The District by and through the named Defendants and Taylor arranged for a Service Plan to be instituted, thereby affording DJ related services to address his asthmatic condition (disability) while in school; thereby purporting to provide DJ with the essential and necessary services affording him a free and appropriate education (FAPE) pursuant to the statutory framework and attendant regulations.

31.    Among other things, the Service Plan and an attendant Asthmatic Reaction Procedure document provided that the student be given medication (inhaler) as prescribed by the child's physician before exercise and when symptoms manifest; to utilize a nebulizer with assistance from the school nurse; and, to notify the school nurse, parent or medical provider promptly of an incident or action taken. The protocol also requires that resuscitative efforts be administered, should the child's condition become critical where such action is necessary.

32.    In furtherance thereof, Taylor provided an inhaler to be administered by the teacher. At the time of the incident leading to his death, his third grade teacher maintained possession of the inhaler. Taylor also arranged for the child's treating physician to communicate directly with school officials. In particular, the physician indicated by written message and oral communication that the child's medication (inhaler) should be administered as herein above indicated.

33.    In addition to the information provided by Taylor and the physician, Taylor had inquired with school officials about the possibility of having the school

purchase a nebulizer to be maintained on the premises for use in the event that a situation arose.   Taylor was at all times relevant an enrollee of a state-sponsored health care program (e.g. Access).   That program provided for the acquisition of only one (1) nebulizer, which was maintained at Plaintiffs' home.

34.   The District refused to purchase or to acquire a nebulizer following Taylor's request.   Taylor managed to save the necessary funds and purchased a nebulizer for use at school.   Accordingly, a nebulizer was maintained in the nurse's office at Wright Elementary for DJ's use and benefit.   At no time since the acquisition of the nebulizer for the school was the device utilized to treat DJ's symptoms, including the child's last experience leading to his death.   Although efforts were made to accommodate the Service Plan and Asthmatic Reaction Procedure document in all respects, including the purchase of a nebulizer for use in an emergency, Plaintiff believes that the named Defendants were not properly trained to use the device; nor was the device used at any time, although application of the nebulizer would have eased the symptoms and allowed for a more timely, proper and effective response to the child's situation.

35.   The aforementioned Asthmatic Reaction Procedure document also detailed actions to be taken if symptoms occur.   In the event that the student's symptoms increased in severity, or there is an absence of breathing, pulse or decreased consciousness, emergency personnel were to be contacted **and** CPR was to be performed by school personnel, if necessary.

36.   The District was provided with all necessary documentation from the child's parent and physician to facilitate the medical aspects of the IEP and its Service Plan and Asthmatic Reaction Procedure document.

8

37.     During the course of his second grade year (school year 2002-03), DJ was hospitalized for a period of approximately one (1) week in January, 2003.  He was airlifted to Pittsburgh Children's Hospital in the early morning hours of January 18, 2003, as a result of suffering an acute bronchial asthmatic attack.  The child had returned from school the day earlier in a lethargic state experiencing difficulty breathing.  Taylor took the child to the Emergency Room, whereby his condition required intensive treatment and intervention from an appropriate facility.  Therefore, the child was taken to Pittsburgh for medical attention.

38.     Taylor appeared at Wright Elementary the following week to advise school personnel of the situation that had transpired over the preceding weekend, which resulted in the hospitalization and DJ's absence from school.

39.     Taylor encountered the second grade teacher who at that time was DJ's teacher.  Taylor described the situation to her.  The teacher indicated to Taylor that DJ had experienced an episode of arduous breathing and lethargy that Friday afternoon (January 17, 2003), requiring the teacher to assist the child to the school office and then to the door in order to walk home at the conclusion of the day.  The teacher expressed her realization that the child's symptoms during school were related to his eventual hospitalization, which indeed was the case.  As herein indicated, Taylor notified all interested school personnel of the situation.  At subsequent meetings the school officials involved with developing and monitoring DJ's IEP and Service Plan with Asthmatic Reaction Procedure learned of the January, 2003, episode, and about the connection between the child's advanced, serious condition and the onset of symptoms the prior afternoon.

40.     At no time prior to Taylor's efforts was she notified of the events taking place in school the day before the child was hospitalized.  In addition, neither the school nurse nor any educator provided care or treatment to DJ in response to his symptoms before the conclusion of the school day in January, 2003.  On the contrary, school personnel permitted the child to return home at the end of the day, without administering medication or contacting Taylor and/or a medical provider.  These decision were made in light of the several facts:  that the child was of relatively tender years; Taylor lived in close proximity to the school, thereby allowing her the opportunity to address immediately any problems that had arisen; the child was a "walker" (living too close to the school to be provided bus transportation); the air was naturally cold in the midst of winter, which further aggravated the situation; and, the child was manifesting symptoms of the asthmatic condition prior to leaving the school premises.

41.     Defendant District and all interested school personnel were aware of the child's disabilities, and were then made aware of the severe consequences that arise if symptoms are not properly treated and monitored.  If not before the events of January, 2003, leading to the child's hospitalization, then afterward all Defendants became aware of the seriousness of the child's condition, especially when left unattended.  Each of the named Defendants knew and understood that the child faced a substantial and real risk of serious injury, if his asthmatic symptoms were not addressed in a timely and proper fashion.  Accordingly, all Defendants were aware and knew of the substantial and real risk of serious injury (including death) facing the child, should the onset of symptoms related to the child's asthma are not addressed timely and/or properly.

42.    In connection with the IEP and its attendant Service Plan and Asthmatic Reaction Procedure document prepared for DJ's third grade year, Taylor provided further responses to a questionnaire supplied by the District,. This questionnaire sought more detailed information from the custodial parent about the child's disabilities and situations that have arisen in connection therewith.   Taylor provided full, complete and timely responses, and therein reiterated that the child had been hospitalized for an extended period of time in January of the preceding school year.   She also advised the Defendants that DJ received treatment from the emergency room on at least ten (10) other occasions during the same period.    Taylor reminded school personnel, those charged with developing the child's IEP and attendant Service Plan and Asthmatic Reaction Procedure, that DJ had suffered serious complications requiring extensive medical care in Pittsburgh as a result of symptoms not being addressed when they manifest.   In addition, the meetings participants, including all of the parties hereto, reviewed and reaffirmed the details of the IEP and attendant Service Plan and Asthmatic Reaction Procedure.   The protocol established the plan to insure DJ's safety and health while at school, thereby purportedly providing adequate, reasonable and necessary accommodations relative to the child's identified disability, asthma.    The documents emanating from the meeting included regular, daily administration of the medicinal inhaler; use of the inhaler when symptoms manifest or strenuous activity is expected; use of the nebulizer, if the child's condition deteriorated; contact with the school nurse, parent or other medical provider; regular and constant monitoring of the child and his breathing labors; and, application of CPR, if the child stopped breathing or suffered a dramatic cessation of vital body functions (e.g. breathing, heart pumping, etc.).   Taylor re-emphasized the severe nature

of the child's asthma condition, as well as the risk of serious injury in the event symptoms are not monitored and addressed in an appropriate manner.   All of the individuals representing the District were aware of such risk of injury, indicated their understanding of said risk.   However, there was little or no change from the previous plans adopted to address the child's disability in light of the IDEA, ADA, and Rehabilitation Act.

43.     During the course of his third grade year (school year 2003-04) prior to his death, DJ's teacher was intimately involved with the school nurse and school principal in the development of the IEP, Service Plan and attendant Asthmatic Reaction Procedure.   Nonetheless, during the few weeks of the school year before the child's death, DJ's third grade teacher regularly failed to administer prescribed medication (inhaler) to the child before recess and other strenuous activities.   At times the child was required to remind the teacher of the medication in order to receive appropriate treatments, while at other times no medication was dispensed.

44.     Following recess on September 24, 2003, DJ complained to his third grade teacher that he was having difficulty breathing, and that he was feeling generally tired (i.e. lethargic).   Defendant Myers responded by suggesting to DJ that he lay his head on the desk to rest.   Defendant Myers did not administer any medication, nor did she contact the school nurse, parent or other medical provider, although the classroom was equipped with a phone.   The child was not permitted to go to the school nurse's office or to the principal's office; nor was the child permitted to contact his parent.   Rather, the child did as he was instructed.   Defendant Myers immediately resumed with the scheduled activities for the remaining students, choosing to allow DJ to remain at his desk without

monitoring his condition.   It is believed and thus averred that the child remained unattended or unmonitored for a period of at least fifteen (15) minutes.

45.   The school nurse was not in the building at that time.   She was not contacted when DJ complained of the problems that he was experiencing.   In addition, Taylor was not contacted relative thereto.   No medical provider was contacted to address the symptoms that the child suffered.   Although Defendant Adams knew that her schedule required her to be at other buildings within the school district at various times, she did not provide for another qualified person, other than the teacher, to manage the Asthmatic Reaction Procedure (or protocol) in the event the child began to experience asthma symptoms (e.g. difficulty breathing and lethargy).

46.   As stated earlier, a significant amount of time passed without Defendant Myers monitoring or attending DJ after his complaints of asthma symptoms.   In fact, another student, DJ's classmate, noticed that the child was turning color (purple) and that DJ was not breathing.   DJ's head remained on his arms atop the desk.

47.   Defendant Myers was not monitoring DJ after his complaints, she being engaged with the children in scheduled activities.   Defendant Myers did approach DJ upon the discovery of his condition, whereby she performed a cursory examination of the situation.   Thereupon, the teacher instructed another child to get Defendant Ritchey, the principal, who was in the school office.   Defendant Myers did not immediately contact emergency personnel, nor did she contact the school nurse or Taylor.

48.   The child who was instructed to retrieve the principal did so, but only after emphasizing to Defendant Ritchey the seriousness of the situation in the classroom.

49.   When the principal and child sent by Defendant Myers returned to the classroom, DJ remained at his desk and the principal likewise performed a cursory examination of the situation. More than several minutes had passed since the classmate brought the situation to Defendant Myers' attention. No medication was given to the child, nor were resuscitative efforts initiated. Furthermore, although no action was taken to address directly the child's situation (e.g. CPR, medication, etc.), there did not appear to be any panic set in the classroom, especially among Defendants Myers and Ritchey.

50.   At some point after discovering the situation (DJ's unresponsiveness, discoloration and lack of breathing), 9-1-1 dispatch was contacted and emergency personnel dispatched to the school.

51.   En route to the school, responding personnel purportedly received another call through 9-1-1 dispatch. The communication asserted that resuscitative efforts were employed and the child had responded by breathing.

52.   However, when the first responders entered the classroom, DJ remained in a seated position. An unidentified adult (whom Plaintiff believes to be Defendant Myers) was standing behind the seated child, a position inappropriate for resuscitative efforts. Upon noticing the emergency responder, this unidentified adult exclaimed, "His doctor told me to do this!"

53.   The first responder immediately placed the child on the floor, and with his partner(s) initiated resuscitative efforts. The child's position (seated), the adult's position (behind the child), and the child's physical condition initially presented to the emergency responders belies any alleged resuscitative efforts prior to the responders' arrival to the scene.

54.   At some point after initially discovering the child's condition, but well after the call to emergency personnel, contact was made with the school nurse and Taylor. This effort was made at least thirty (30) minutes after the child first indicated complaints of asthma symptoms. Taylor, who lives in close proximity to the school, arrived within minutes of receiving a call from the school that DJ needed to be picked-up because he was not feeling well (i.e. complaining of asthma symptoms). As herein indicated, the school nurse was not scheduled to be at Wright Elementary that day. Defendant Adams (school nurse) and Taylor each appeared at the school as emergency responders were already preparing to transport DJ to Altoona Hospital.

55.   Taylor was not informed of the severity of the situation when school personnel finally contacted her. Immediately prior to her arrival at the school, she believed that DJ simply had an episode (suffering symptoms) and needed to come home. Although not a frequent occurrence, Taylor had traveled on several occasions to school (prior school years) in order to bring DJ home upon experiencing asthma symptoms. Contacting Taylor in such circumstances was consistent with the protocol established in connection with the IEP, Service Plan and attendant Asthmatic Response Procedure.

56.   Upon arriving at the school, Taylor noticed the emergency response vehicles parked outside the building, and the school nurse frantically approaching the entrance from another part of the parking lot. Taylor asked if all this (her hurried approach, the emergency vehicles) was for DJ. The school nurse said she believed so, although the exact circumstances were unclear to her at the moment. The emergency responders were already moving the child down the steps and into the waiting ambulance.

57.     Prior to being transported to Altoona Hospital, emergency personnel were on scene for more than ten (10) minutes attempting to resuscitate the child, but without any success.  By all indications then, at the hospital, and post-mortem, no medication was provided to the child and no resuscitative efforts were employed prior to the emergency personnel's arrival.  DJ was then transported to Altoona Hospital Emergency Room, where resuscitative efforts continued.  Medical providers were able to maintain DJ's vital signs, and then determined to transport the child to Pittsburgh for more intensive care.

58.     DJ died on September 27, 2003.  The autopsy confirmed the cause of death to be acute bronchial asthma.

59.     Notwithstanding the visual evidence and the child's physical condition indicating no resuscitative efforts were administered prior to the arrival of emergency responders, Defendants continued to maintain that school personnel performed resuscitative efforts prior to the arrival of the emergency responders.  Defendants suggested this scenario to investigating officers from the Altoona Police Department and to medical personnel creating a medical history of the incident.

60.     Contrary to statements by school personnel that resuscitative efforts had been applied, these Defendants failed to satisfy their obligations pursuant to the above-indicated statutory framework, the IEP, the Service Plan and attendant Asthmatic Response Procedure.

61.     The Defendants inconsistently adhered to the daily medicinal regimen, at times having to be reminded by the child.  Defendants failed to administer medication during the school day in question.  Defendants also failed to contact Taylor when the symptoms were first reported in order that she may attend to her child's needs.

Defendants, and especially Defendant Myers, failed to monitor the child's condition when first reported, electing instead to devote energies and attention to the classmates and their school lessons.

62.     These Defendants were on notice that asthma symptoms, even those appearing to be relatively minor in nature, can have serious consequences to DJ, if left unattended.  Defendants possessed the foreknowledge that DJ was exposed to substantial and real risk of serious bodily injury in the event of an onset of asthma symptoms, unless such circumstances are given appropriate attention.  This knowledge and understanding derives from several sources, including but not limited to Defendant Adams' expertise as a registered nurse; the reason for and the terms of the IEP, Service Plan and attendant Asthmatic Response Procedure; Taylor's representations at meetings with school officials; communication from the child's treating physician; and, DJ's hospitalization earlier in the year (January, 2003), which all parties agreed was related to the onset of symptoms which manifested during the school day.

63.     Defendant Myers' affirmative decision to instruct the child to remain at his desk, while failing to alert appropriate persons of the situation, and while intending to return her attention immediately and directly to the other students, constitutes not only a violation of the IEP, Service Plan and attendant Asthmatic Response Procedure, but also constitutes action knowingly indifferent towards the substantial and real risk of serious injury (including death) to which the child was exposed.  Accordingly, the District and its personnel failed to adhere to the requirements of the IEP and/or take responsible, appropriate actions to address the child's complaints and symptoms.

64.     If the Defendants had followed protocol established by the mentioned documents generated pursuant to statutory mandates, DJ would not have suffered significant deterioration of his condition leading to his death.  The failure to administer medicine before recess, and when the child complained of symptoms was an utterly reckless and knowing disregard for the substantial and real risk of serious injury.  The failure to contact the school nurse or the parent constitutes an utterly reckless and knowing disregard for the substantial and real risk of serious injury.  Finally, failing to administer resuscitative efforts likewise disregarded the child's interests and need for immediate attention to his deteriorating condition.

65.     The Defendants' actions, failures and omissions constitute reckless indifference or callous disregard of the substantial and real risk of serious injury to which the child was exposed with the onset of symptoms that required immediate attention, but for which he did not receive.  Defendants were aware of these risks and disregarded same.

66.     The child being in third grade and a month shy of his ninth birthday, DJ and the Defendants stood in a special custodial relationship to each other.  Defendants had the affirmative duty to ensure the child's health, welfare and safety.  For the above-stated reasons, Defendants have failed to satisfy their affirmative responsibilities with respect thereto.

67.     The child was unable to contact his parent, seek medical attention on his own accord, or in any other way act to gain assistance for symptoms directly related to his life-threatening condition.  Nor could the parent have exercised parental control to

accommodate the child's needs, since school personnel did not contact Taylor until after emergency responders were dispatched to the school.

68.     To the extent any singular event or decision relative to the Defendants' responses to the situation may be characterized as "negligence," the totality of events from at least January, 2003, and throughout the day in question, coupled with the knowledge and understanding Defendants derived as a result thereof, demonstrates a pattern of reckless decisions and conduct that utterly disregards the substantial risks associated with a life-threatening condition such as severe asthma.

69.     The District failed to provide for an adequate number of school personnel trained to recognize the onset of asthmatic symptoms, as well as the substantial and real risk of serious injury associated therewith.   The District knew the school nurse was scheduled to be in different building on different days, but failed to provide an adequate source of trained medical providers in her absence to deal with medical situations known or foreseeable by the District relative to children subject to health care directives, including but not necessarily limited to asthma. DJ's loss of life, liberty and the right to a fair and appropriate public education were directly related to and/or caused by the actions and decisions of these Defendants.

70.     These Defendants developed and maintained policies, practices and/or customs that acquiesced in and caused the deprivation of Plaintiffs' rights as herein indicated.

71.     These Defendants were aware of the practices, including the establishment of the IEP, Service Plan and Asthmatic Response Procedure, and violated those practices

in such a manner as to allow the child to remain exposed to the substantial and real risk of serious injury from the lack of an appropriate response to the onset of asthma symptoms.

72.    As a direct and proximate result of Defendants' actions, failures and omissions heretofore set forth, DJ suffered serious injury leading to his death.  The tragic conclusion of these events would have been adverted, if the responsible persons (these Defendants) charged with developing and implementing the IEP, Service Plan and attendant Asthmatic Response Procedure, had adhered to same.  In addition to DJ's losses, Taylor has suffered great emotional stress, anxiety, depression and other injuries as a result of the loss of DJ's love and companionship.

***COUNT I***
***Plaintiffs vs. Michelle Adams, R.N.***
***Violation of IDEA***

73.    The averments and allegations set forth in this Amended Complaint are incorporated herein by reference.

74.    Defendant, by her actions and omissions, has deprived DJ of his rights under IDEA, 20 U.S.C. Section 1400, *et seq.*

75.    As school nurse for the defendant school district, Defendant Adams was a responsible participant among the team of professionals dedicated to the development and to the implementation of DJ's health care directive.

76.    Development and implementation of the health care directive is required under the federal law in order to provide necessary and reasonable accommodation for an identified child suffering from a recognized disability; thereby affording the child an opportunity for a free and appropriate public education as required by law.

20

77.     In connection therewith, Defendant Adams received communication from the DJ's asthma specialist indicating that the use of medication in the form of an inhaler should be made an aspect of the child's health care directive.  The physician instructed that the use of the prescribed medication should be used on a daily basis, including before strenuous activity and when symptoms manifest.

78.     Defendant Adams played an instrumental role in establishing the protocol set forth in the health care directive, purporting to provide reasonable accommodations for DJ's disability that would allow him to receive a free and appropriate public education.

79.     Defendant Adams knew that DJ's asthma posed a serious, substantial and real threat to his well-being, especially when symptoms of the condition manifest. Nurse Adams' knowledge in this respect derives from her experience and training as a registered nurse, employed by the defendant school district in the capacity of school nurse. Moreover, Defendant Adams was aware that the child had previously experienced unattended symptoms while in school the previous semester, thereby placing her on notice that a similar manifestation of symptoms constituted a threat to the child's well-being, including leading to death.

80.     To the extent the applicable standard required hereunder involves a subjective test relative to the standard of care, Defendant Adams knew DJ would be at a substantial risk of serious harm, including death, if his condition was not monitored and attended when symptoms manifest.

81.     In the alternative, to the extent the applicable standard required hereunder allows for an objective test relative to the standard of care, Defendant Adams knew or

should have known DJ would be at a substantial risk of serious harm, including death, if his condition was not monitored and attended when necessary.

82.     Defendant Adams knew her schedule requires that she attend or appear at schools other than Wright Elementary School within the defendant school district. Accordingly, she also knew that to establish an effective health care directive, protocol must be incorporated to address properly in her absence the child's medical needs in light of the known disability.

83.     Defendant Adams knew of the defendant school district's policy prohibiting children from carrying and/or self-administering prescribed medications, including but not limited to DJ's inhaler.  She established the health care directive's protocol with an understanding of this policy, thereby designating the child's teacher and herself as individuals authorized to dispense DJ his prescribed medication.

84.     Defendant Adams breached her responsibilities and duties required and/or imposed by the IDEA and regulations promulgated thereunder in the following respects, pled jointly and in the alternative:

a.     Failing to establish a protocol that adequately and effectively addressed DJ's asthma condition, a recognized disability for which  reasonable accommodations are required to insure the child receives a free and appropriate public education;

b.     Failing to establish a protocol that insured the child's medication would be dispensed on a daily basis, including before strenuous activities and when symptoms manifest;

c.     Failing to instruct or train properly those educators reasonably expected to have contact (or custodial contact) with the child within the school setting, in order to

insure the child's condition is monitored, symptoms recognized when manifest, and if necessary, the implementation of appropriate, timely action taken to address the circumstances presented;

     d.     Failing to secure and/or to utilize appropriate financial resources for the training of educators reasonably expected to have contact (or custodial contact) with the child within the school setting, in order to insure the child's condition is monitored, symptoms recognized when manifest, and if necessary, the implementation of appropriate, timely action taken to address the circumstances presented;

     e.     Failing to provide a protocol utilized in her absence from DJ's school allowing for the child's condition to be regularly monitored without distraction or interruption, thereby insuring that appropriate, timely action is taken in the event the child's condition deteriorates and/or the symptoms become more severe;

     f.     Failing to provide a protocol utilized in her absence that requires immediate contact with her, the child's parent, or other party authorized to dispense medication or to seek further medical care in the event symptoms manifest and/or the child's condition deteriorates;

     g.     In developing and/or adhering to defendant school district's policy, preventing DJ from administering medication himself, thereby precluding the child's efforts at self-preservation;

     h.     In determining that the established protocol set forth in the health care directive effectively accommodated DJ's asthma, a recognized disability; and,

     i.     Other acts or omissions related to the development and/or to the implementation of the health care directive as may be discovered.

85.     In all of the above-indicated respects, Defendant Adams failed to satisfy the requirements of the IDEA (and related regulations) with respect to DJ's interests as an identified child with a recognized disability.

86.     As a direct and proximate result thereof, DJ suffered unabated and increasingly severe symptoms related to his asthma, culminating in the child's death.

87.     As a direct and proximate result thereof, DJ was deprived of a free and appropriate public education in an environment that accommodated his reasonable needs arising from the recognized disability, asthma.

### COUNT II
### Plaintiffs vs. Defendant Carol Myers
### Violation of IDEA

88.     The averments and allegations set forth in this Amended Complaint are incorporated herein by reference.

89.     Defendant, by her actions and omissions, has deprived DJ of his rights under IDEA, 20 U.S.C. Section 1400, *et seq.*

90.     As DJ's third grade teacher employed by the defendant school district, Defendant Myers was a responsible participant among the team of professionals dedicated to the development and to the implementation of DJ's health care directive.

91.     Development and implementation of the health care directive is required under the federal law in order to provide necessary and reasonable accommodation for an identified child suffering from a recognized disability; thereby affording the child an opportunity for a free and appropriate public education as required by law.

92.     In connection therewith, Defendant Myers received communication from the DJ's asthma specialist indicating that the use of medication in the form of an inhaler

should be made an aspect of the child's health care directive. The physician instructed that the use of the prescribed medication should be used on a daily basis, including before strenuous activity and when symptoms manifest.

93.     Defendant Myers played an instrumental role in establishing the protocol set forth in the health care directive, purporting to provide reasonable accommodations for DJ's disability that would allow him to receive a free and appropriate public education.

94.     Defendant Adams knew that DJ's asthma posed a serious, substantial and real threat to his well being, especially when symptoms of the condition manifest. Defendant Myers' participation in the development of the health care directive allowed her to be privy to the child's medical history, including the events leading to the child's hospitalization the prior semester.

95.     To the extent the applicable standard required hereunder involves a subjective test relative to the standard of care, Defendant Myers knew DJ would be at a substantial risk of serious harm, including death, if his condition was not monitored and attended when symptoms manifest.

96.     In the alternative, to the extent the applicable standard required hereunder allows for an objective test relative to the standard of care, Defendant Adams knew or should have known DJ would be at a substantial risk of serious harm, including death, if his condition was not monitored and attended when necessary.

97.     Defendant Myers' actions and omissions constitute, in whole or in part, conduct involving unconscionable reckless indifference to the substantial and real risk of