## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SONYA TAYLOR, Administratrix of ) | |
| The Estate of Devin J. Taylor, and in ) | |
| Her own Right, ) | |
| Plaintiff, ) | CIVIL ACTION NO. 05-350J |
| ) | |
| v. ) | |
| ) | JUDGE KIM R. GIBSON |
| ALTOONA AREA SCHOOL DISTRICT, ) | |
| ALTOONA AREA SCHOOL BOARD, ) | |
| SUZANNE RITCHEY, CAROL MYERS, ) | |
| MICHELLE ADAMS, R.N., ) | |
| Defendants. ) | |

## MEMORANDUM OPINION and ORDER OF COURT

**Gibson, J.**

### SYNOPSIS

This matter comes before the Court on the Defendants' Motion to Dismiss, which has been filed

pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. (Document No. 21). For the reasons that follow,

the Defendants' Motion to Dismiss will be granted in part and denied in part.

### BACKGROUND

The Plaintiff, Sonya Taylor ("Taylor"), commenced this action on August 30, 2005, against the

Altoona Area School District (the "District"), the Altoona Area School Board (the "Board"), Suzanne

Ritchey ("Ritchey"), Carol Myers ("Myers"), and Michelle Adams, R.N. ("Adams"), alleging violations

of the Individuals with Disabilities Education Act (the "IDEA") [20 U.S.C. § 1400 *et seq.*], the

Rehabilitation Act [29 U.S.C. § 701 *et seq.*], the Americans with Disabilities Act (the "ADA") [42

U.S.C. § 12101 *et seq.*], the Pennsylvania Wrongful Death Statute [42 Pa.C.S. § 8301], the

1

Pennsylvania Survival Statute [42 Pa.C.S. § 8302], and the Fourteenth Amendment to the Constitution of the United States. (Document No. 1). On October 11, 2005, the Defendants filed a Motion to Dismiss and/or Motion for a More Definite Statement pursuant to *Federal Rules of Civil Procedure 12(b)(6)* and *12(e)*. (Document No. 8). This Court disposed of that Motion in a memorandum opinion dated September 28, 2006, in which the Defendants' Motion to Dismiss was granted in part, and in which the Defendants' Motion for a More Definite Statement was granted with respect to certain counts for which the Motion to Dismiss was denied. *Taylor v. Altoona Area School District*, 2006 U.S. Dist. LEXIS 70853 (W.D.Pa. September 28, 2006)("*Taylor I*"). The Court granted Taylor leave to amend upon the granting of the Defendants' Motion to Dismiss. *Taylor I*, 2006 U.S. Dist. LEXIS 70853, at *50. Taylor filed an Amended Complaint on November 9, 2006. (Document No. 20). Thereafter, on November 20, 2006, the Defendants filed another Motion to Dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. (Document No. 21). Since the matter comes before the Court in this context, the allegations contained in the Amended Complaint are assumed to be true. *Anza v. Ideal Steel Supply Corp.*, 126 S.Ct. 1991, 1994, 164 L.Ed.2d 720, 726 (2006); *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 475, 119 S.Ct. 2139, 2143, 144 L.Ed.2d 450, 458 (1999).

According to the Amended Complaint, Devin J. Taylor ("Devin") was born on October 12, 1994. (Document No. 20, p. 3, ¶ 8). He was a student at Wright Elementary School ("Wright"), which is located within the District. *Id.* Taylor is Devin's natural mother, and she served as his primary physical and legal custodian. (*Id.*, ¶ 9). She is also the administratrix of Devin's estate. *Id.* At all relevant times, Taylor and Devin resided in Altoona, Pennsylvania, within the territorial limits of the District. *Id.* Moreover, during the relevant period of time, Ritchey was the principal at at Wright, Adams

was a school nurse for the District, and Myers was Devin's third-grade teacher. (*Id.*, p. 4, ¶¶ 11-14).

Devin was identified as, recognized as, and known to be a student with disabilities because of his asthma and related breathing problems. (*Id.*, p. 6, ¶ 28). For this reason, Taylor and the Defendants developed an Individualized Education Program ("IEP") in conformity with 20 U.S.C. §§ 1412(a)(4) and 1414(d), which are contained in the IDEA. (*Id.*, p. 7, ¶ 29). Pursuant to the IEP, Taylor and the Defendants arranged for a Service Plan to be instituted, affording Devin the appropriate services to address his asthmatic condition while he was attending school. (*Id.*, p. 7, ¶ 30). This was the District's way of providing Devin with a free appropriate public education ("FAPE") within the meaning of § 1412(a)(1).

Included within the Service Plan was a document outlining an Asthmatic Reaction Procedure ("ARP"), which required: (1) that Devin be given medication (i.e., use of an inhaler) as prescribed by his physician before exercising and when symptoms began to manifest themselves; (2) that Devin be able to utilize a nebulizer with the assistance of a school nurse; (3) that the school nurse, the appropriate medical provider or Taylor be notified promptly of any related incidents, and the actions taken in response thereto; and (4) that resuscitative efforts be administered in the event that Devin's medical condition were to warrant such action. (*Id.*, ¶ 31). Taylor provided an inhaler for Wright, which was in Myers' possession at the time of the incident leading to Devin's death. (*Id.*, ¶ 32). Arrangements had also been made for Devin's physician to communicate directly with the relevant school officials. *Id.* The physician indicated in writing that Devin's inhaler should be administered in accordance with the Service Plan and the ARP. *Id.*

Taylor sought to have the District purchase a nebulizer for Devin pursuant to the Access

3

program, which was a state-sponsored health care program. (*Id.*, pp. 7-8, ¶ 33). The Access program provided for the acquisition of one nebulizer, which was kept at Devin's home. *Id.* The District refused to purchase an additional nebulizer for Devin. (*Id.*, p. 8, ¶ 34). Consequently, Taylor saved sufficient funds to purchase an additional nebulizer, which was kept at Wright. *Id.* Nevertheless, the nebulizer was never utilized by Wright to treat Devin's symptoms. *Id.* Taylor apparently believes that none of the Defendants were properly trained to use the device. *Id.*

The ARP mandated that certain actions be taken if Devin were to manifest asthmatic symptoms. (*Id.*, ¶ 35). School personnel were directed to perform CPR and contact emergency medical personnel in the event that Devin were to experience breathing difficulties, a decreased pulse or a decreased level of consciousness. *Id.* The District was provided with the documentation necessary to facilitate Devin's IEP, Service Plan and ARP. (*Id.*, ¶ 36).

In the early morning hours of January 18, 2003, Devin was airlifted to Children's Hospital in Pittsburgh, Pennsylvania, after suffering an acute bronchial asthmatic attack. (*Id.*, p. 9, ¶ 37). At the time, Devin was a second-grader. *Id.* He had returned from school on the previous day in a lethargic state. *Id.* He had apparently experienced breathing difficulties. *Id.* After Taylor took Devin to an emergency room, the decision was made to airlift him to Children's Hospital. *Id.*

The next week, Taylor went to Wright and explained to school personnel why Devin had been absent from school. (*Id.*, ¶ 38). She spoke with Devin's second-grade teacher, who explained to her that on January 17, 2003, Devin had experienced "an episode of arduous breathing and lethargy." (*Id.*, ¶ 39). The teacher explained that she had assisted Devin to the school office, and later to the door. *Id.* Nevertheless, Devin walked home on his own at the conclusion of the day. *Id.* The teacher expressed

4

to Taylor the view that Devin's manifestation of such symptoms had been related to his hospitalization shortly thereafter. *Id.* The school officials involved with Devin's IEP, Service Plan and ARP were made aware of this episode. *Id.*

Prior to Devin's hospitalization, Taylor had not been informed of Devin's breathing difficulties during the previous day of school. (*Id.*, p. 10, ¶ 40). On that day, Devin had not been provided with medical assistance. *Id.* Instead, he had been left to walk home alone, despite the fact that his symptoms could be aggravated by the cold winter air. *Id.* Subsequent to Devin's hospitalization, the Defendants were made aware of the risks associated with inattention to his asthmatic symptoms. (*Id.*, ¶ 41). When Devin entered the third grade, Taylor responded to a questionnaire from the District seeking more detailed information about Devin's medical problems. (*Id.*, p. 11, ¶ 42). She indicated that Devin had been treated in an emergency room on at least ten prior occasions, and that serious complications had arisen in situations where his symptoms had not been addressed quickly after manifesting themselves. *Id.* The IEP, Service Plan and ARP adopted for the 2003/2004 school year required: (1) that Devin's inhaler be administered on a daily basis; (2) that the inhaler be administered upon the manifestation of symptoms or the commencement of strenuous activity; (3) that Devin be provided the opportunity to utilize the nebulizer when his condition deteriorated; (4) that Taylor, the school nurse and Devin's physician remain in contact about Devin's medical condition; (5) that Devin's breathing be monitored to ensure his safety; and (6) that CPR be performed on Devin if he were to stop breathing or experience a dramatic cessation of vital bodily functions. *Id.*

At the beginning of the 2003/2004 school year, Myers was intimately involved with the development of Devin's IEP, Service Plan and ARP. (*Id.*, p. 12, ¶ 43). Nevertheless, she regularly

5

failed to administer Devin's inhaler before recess and other strenuous activities. *Id.* On some occasions, she gave Devin the inhaler only after he reminded her to do so. *Id.* On other occasions, the inhaler was simply not administered. *Id.*

After returning from recess on September 24, 2003, Devin told Myers that he was experiencing breathing difficulties and lethargy. (*Id.*, p. 12, ¶ 44). Myers responded by telling Devin to rest by laying his head on his desk. *Id.* She did not administer Devin's inhaler, nor did she contact anyone else. *Id.* There was a telephone inside of the classroom. *Id.* Devin was not permitted to go to the nurse's office, nor was he permitted to contact Taylor. *Id.* Instead, he laid his head on his desk pursuant to Myers' instructions. *Id.* Myers continued with the scheduled activities for the other students as Devin waited at his desk. *Id.* Devin's medical condition was left unmonitored for a period of about fifteen minutes. (*Id.*, p. 13, ¶ 44).

Adams was not at Wright at that time, nor was she contacted when Devin began to experience these asthmatic symptoms. (*Id.*, ¶ 45). No other medical providers were contacted. *Id.* Although Adams knew that she would not be at Wright on that day, she did not make arrangements for another health care provider to manage Devin's ARP protocol during her absence. *Id.* As Devin remained at his desk, one of his classmates noticed that he was not breathing and had turned purple. (*Id.*, ¶ 46). Upon learning of the severity of Devin's condition, Myers instructed another student to go and tell Ritchey to come to the classroom. (*Id.*, ¶ 47). She did not immediately contact Taylor, nor did she inform medical personnel of the situation. *Id.*

When Ritchey entered the classroom, Devin remained at his desk. (*Id.*, p. 14, ¶ 49). No medications or resuscitative efforts were initiated. *Id.* Emergency medical personnel were eventually

6

contacted. (*Id.*, ¶ 50). While en route to Wright, the emergency medical providers received a second phone call. (*Id.*, ¶ 51). The caller indicated that resuscitative efforts had been initiated, and that Devin had responded by breathing. *Id.* Nevertheless, when the emergency medical providers entered the classroom, Devin remained seated in his chair. (*Id.*, ¶ 52). An unidentified adult, who Taylor believes to be Myers, was standing behind Devin. *Id.* When the medical personnel entered the classroom, she exclaimed, "His doctor told me to do this!" *Id.* The medical providers immediately placed Devin on the floor and initiated resuscitative efforts. (*Id.*, ¶ 53).

Taylor and Adams were not contacted until approximately thirty minutes after the onset of Devin's symptoms. (*Id.*, p. 15, ¶ 54). Taylor, who lived in close proximity to Wright, arrived within minutes of learning that Devin was not feeling well. *Id.* Taylor and Adams both arrived as the emergency medical personnel were preparing to transport Devin to Altoona Hospital. *Id.* Prior to her arrival, Taylor had been under the impression that Devin simply needed to be picked up and taken to his home. (*Id.*, ¶ 55). On prior occasions, she had taken Devin home in response to his experiencing asthmatic symptoms. *Id.* The school's decision to contact Taylor under such circumstances was consistent with Devin's IEP, Service Plan and ARP. *Id.* Upon her arrival at Wright, Taylor noticed the presence of emergency vehicles. (*Id.*, ¶ 56). Adams was frantically approaching the door from another part of the parking lot. *Id.* When Taylor asked Adams whether the emergency responders were on the scene in response to Devin's condition, Adams indicated that she believed that to be the case. *Id.* By that time, the emergency responders had already begun to take Devin to the ambulance outside. *Id.*

Before transporting Devin to Altoona Hospital, the emergency respo nders attempted to resuscitate Devin for a period of ten minutes, but they were not successful. (*Id.*, p. 16, ¶ 57). After

7

Devin arrived at the emergency room, the medical providers at Altoona Hospital were able to maintain his vital signs. *Id.* Devin was subsequently transported to Pittsburgh for more intensive medical care. *Id.* On September 27, 2003, Devin died. (*Id.*, ¶ 58). An autopsy confirmed the cause of death to be acute bronchial asthma. *Id.* Medical evidence obtained both prior to and after Devin's death indicated that no medication or resuscitative efforts had been employed by school personnel prior to the arrival of the emergency medical responders. (*Id.*, ¶¶ 57, 59). Nevertheless, the Defendants insisted to investigating officers from the Altoona Police Department and to investigating medical personnel that they had employed such resuscitative efforts prior to the arrival of the emergency responders. (*Id.*, ¶ 59).

Taylor alleges that the Defendants failed to adhere to Devin's IEP, Service Plan and ARP, and that adherence to such mandates would have prevented his tragic death. (*Id.*, p. 20, ¶ 72). She alleges that the Defendants violated the IDEA, the Rehabilitation Act, the ADA, the Fourteenth Amendment, the Wrongful Death Statute and the Survival Statute. (Document Nos. 20, pp. 20-25, ¶¶ 73-97, 20-2, pp. 1-23, ¶¶ 98-229). She brings these claims against the Defendants both as the administratrix of Devin's estate and on her own behalf.

## DISCUSSION

Taylor's Amended Complaint contains a total of twenty-one (21) counts. (Document Nos. 20, pp. 20-25, ¶¶ 73-97, 20-2, pp. 1-23, ¶¶ 98-229). The Defendants seek the dismissal of all but three counts. (Document No. 21, p. 2). Counts IV, VIII and XII allege violations of the IDEA, the Rehabilitation Act and the ADA against the District. (Document No. 20-2, pp. 6-7, 10-11, 14-15, ¶¶ 116-120, 143-149, 171-177). Those counts are not challenged in the Motion to Dismiss and, hence, will

8

not be addressed in this memorandum opinion.

## A. The Individuals with Disabilities Education Act (IDEA) Claims[1]

Counts I, II and III of the Amended Complaint assert IDEA claims against Adams, Myers and Ritchey, respectively. (Document Nos. 20, pp. 20-25, ¶¶ 73-97, 20-2, pp. 1-6, ¶¶ 98-115). Also relevant to the IDEA analysis is Count XIII, which alleges violations of the IDEA, the Rehabilitation Act and the ADA and seeks redress against all of the Defendants under 42 U.S.C. § 1983. (Document No. 20-2, pp. 15-16, ¶¶ 178-182). Thus, Taylor's Amended Complaint contains claims against Adams, Myers and Ritchey both *directly under* the IDEA and under § 1983 for alleged violations of the IDEA. In their first Motion to Dismiss, the Defendants asked the Court to dismiss all claims against these three individuals to the extent that they were sued in their personal capacities. (Document No. 8, pp. 3-4, ¶¶ 2-10). The Court declined to do so for two reasons. First of all, there was an intervening clarification of the applicable law concerning the evaluation of a qualified immunity defense raised against a vaguely worded complaint. *Taylor I*, 2006 U.S. Dist. LEXIS 70853, at *55-63. Consequently, the Court directed the parties to proceed in accordance with the decision of the United States Court of Appeals for the Third Circuit in *Thomas v. Independence Township*, 463 F.3d 285 (3d Cir. 2006). *Id.* The Court also noted that the Defendants had not advanced specific arguments as to whether Adams, Myers and Ritchey could be sued in their personal capacities under the IDEA, the Rehabilitation Act or the ADA, and that resolution of such issues without appropriate briefing by the parties would be inappropriate. *Id.* at *56-59.

---

[1] The Court will discuss the particular claims in the order in which they appear in the Amended Complaint, rather than in the order in which they appear in the Motion to Dismiss.

9

The parties have now briefed these issues, but yet another change in the applicable law has occurred since the filing of Taylor's Amended Complaint and the Defendants' Motion to Dismiss. A few months ago, the United States Court of Appeals for the Third Circuit issued its decision in *A.W. v. The Jersey City Public Schools*, 486 F.3d 791, 794-803 (3d Cir. 2007), holding that the IDEA's comprehensive remedial scheme evinces a congressional intent to preclude § 1983 liability for violations of the IDEA. The Court of Appeals repudiated its prior decision in *W.B. v. Matula*, 67 F.3d 484 (3d Cir. 1995), which had held that IDEA violations were actionable under § 1983. *Jersey City*, 486 F.3d at 795-799. Although *Matula* was binding precedent in this circuit at the time of the filing of the Amended Complaint, it is no longer good law today. Consequently, to the extent that Count XIII asserts an IDEA claim under § 1983, *Jersey City* mandates its dismissal.[2] Therefore, the Court will grant the Defendants' Motion to Dismiss with respect to Count XIII of the Amended Complaint, to the extent that Count XIII asserts claims against Adams, Myers, Ritchey and the District under § 1983 for violations of the IDEA.

In *Jersey City*, the Court of Appeals specifically noted that it had no occasion to consider whether individuals could be sued directly under the IDEA, rather than under § 1983 for IDEA violations. *Jersey City*, 486 F.3d at 794-795, n. 4. That issue is before this Court, however, since

---

[2] In their Motion to Dismiss, the Defendants do not specifically address the question of § 1983 liability for violations of the IDEA, opting instead to address § 1983 liability solely within the context of Taylor's Fourteenth Amendment claims. (Document No. 21, pp. 8-10, ¶¶ 25-32). The Court is unsure why the Defendants have not addressed the issues related to § 1983 liability for statutory violations. Nevertheless, they clearly seek the dismissal of Count XIII of the Amended Complaint. (Document No. 21, p. 2). Moreover, since *Jersey City* was not decided until after the filing of the instant Motion to Dismiss, *Matula* was the applicable precedent at the time of the latest filings in this case. For this reason, the Court will construe the Defendants' argument in favor of dismissal of the IDEA claims against Adams, Myers and Ritchey as arguments for dismissal of both the claims directly under the IDEA and the claims under § 1983 for violations of the IDEA. *Jersey City* clearly requires the dismissal of Taylor's § 1983 claims for IDEA violations.

Counts I, II and III of the Amended Complaint assert claims against Adams, Myers and Ritchey under the IDEA. The Defendants do not specifically argue that there is no individual liability under the IDEA. (Document No. 21, pp. 7-8, ¶¶ 19-24). Instead, they argue that Adams, Myers and Ritchey are entitled to qualified immunity. *Id.* Nevertheless, in order to properly evaluate the qualified immunity defense in this case, the Court must address the "threshold question" of whether the Amended Complaint alleges conduct which would violate the IDEA. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272, 281 (2001). Thus, the amenability of individuals to suit under the IDEA is properly before the Court, even though Adams, Myers and Ritchey assert only their entitlement to qualified immunity. *Jersey City*, 486 F.3d at 794 ("Thus, the availability of § 1983 to remedy the alleged violations of A.W.'s statutory rights is part and parcel of our 'threshold' inquiry into defendants' qualified immunity defense.").

The Court's inquiry has revealed a split among district courts within this circuit as to whether the IDEA provides for individual liability. Some courts have stated that there is no individual liability directly under the IDEA. *Colon v. Colonial Intermediate Unit 20*, 443 F.Supp.2d 659, 669 (M.D.Pa. 2006); *P.N. v. Greco*, 282 F.Supp.2d 221, 239 (D.N.J. 2003). Others have determined that individuals can be held liable under the IDEA. *J.F. v. School District of Philadelphia*, 2000 WL 361866, at *8, 2000 U.S. Dist. LEXIS 4434, at *54, 59 (E.D.Pa. April 7, 2000); *Salisbury Township School District v. Jared M.*, 1999 WL 562753, at *4, 1999 U.S. Dist. LEXIS 11687, at *10 (E.D.Pa. July 22, 1999). Therefore, a close examination of the conflicting authority, along with some historical background, is warranted.

In *Smith v. Robinson*, 468 U.S. 992, 1009, 104 S.Ct. 3457, 3467, 82 L.Ed.2d 746, 763 (1984),

the United States Supreme Court construed the Education of the Handicapped Act ("EHA"), the IDEA's predecessor, to be "the exclusive avenue through which a plaintiff may assert an equal protection claim to a publicly financed special education." The Supreme Court concluded that Congress had intended to preclude § 1983 liability for violations of the Equal Protection Clause in situations where a handicapped child asserted a right to a free appropriate public education, "based *either* on the EHA *or* on the Equal Protection Clause of the Fourteenth Amendment[.]" *Smith*, 468 U.S. at 1013, 104 S.Ct. at 3469, 82 L.Ed.2d at 766 (emphasis added). Under *Smith*, conduct which violated the EHA was actionable *only* within the confines of the remedial scheme established by the EHA, even if that same conduct independently violated the Constitution. *Smith*, 468 U.S. at 1011, 104 S.Ct. at 3468, 82 L.Ed.2d at 764 ("In light of the comprehensive nature of the procedures and guarantees set out in the EHA and Congress' express efforts to place on local and state educational agencies the primary responsibility for developing a plan to accommodate the needs of each individual handicapped child, we find it difficult to believe that Congress also meant to leave undisturbed the ability of a handicapped child to go directly to court with an equal protection claim to a free appropriate public education."). Thus, the EHA was construed to carve an exception into § 1983, which was otherwise available to redress constitutional violations. *Smith*, 468 U.S. at 1012, 104 S.Ct. at 3468, 82 L.Ed.2d at 765 ("Nevertheless, § 1983 is a statutory remedy and Congress retains the authority to repeal it or replace it with an alternative remedy.").

Congress responded to *Smith* by amending the EHA in 1986 to void *"Smith*'s broad holding that the EHA preclude[d] overlapping but independent claims otherwise cognizable under the Constitution, the Rehabilitation Act, or other Federal laws." *Padilla v. School District No. 1*, 233 F.3d 1268, 1273

12

(10th Cir. 2000); Pub. L. No. 99-372, 100 Stat. 796 (1986). The relevant statutory language, which is now codified as a part of the IDEA, provides:

(l) **Rule of construction.** Nothing in this title [20 U.S.C. § 1400 *et seq.*] shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973 [29 U.S.C. § 790 *et seq.*], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this part [20 U.S.C. § 1411 *et seq.*], the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this part [20 U.S.C. § 1411 *et seq.*].

20 U.S.C. § 1415(l). Subsequent to the amendment, the United States District Court for the District of Colorado, in *Padilla v. School District No. 1*, 35 F.Supp.2d 1260, 1269, n. 4 (D.Colo. 1999), construed the amended statutory language to create a cause of action under the IDEA. In two later decisions, the United States District Court for the Eastern District of Pennsylvania followed the reasoning of *Padilla*, holding that individual liability existed for violations of the IDEA's substantive provisions. *J.F.*, 2000 WL 361866, at \*18, 2000 U.S. Dist. LEXIS 4434, at \*54, 59; *Salisbury Township School District*, 1999 WL 562753, at \*4, 1999 U.S. Dist. LEXIS 11687, at \*10.

In subsequent years, courts began to recognize that the reasoning employed in *Padilla* had been erroneous. The statutory language contained in 20 U.S.C. § 1415(l) was added not to create individual liability under the IDEA itself, but rather to permit plaintiffs to pursue remedies independently available under other statutes for the same conduct that violates the IDEA. *Diaz-Fonseca v. Commonwealth of Puerto Rico*, 451 F.3d 13, 29 (1st Cir. 2006)("We read the caveat set out in 20 U.S.C. § 1415(l) as intended to ensure that the IDEA does not restrict rights and remedies that were already independently available through other sources of law."). In other words, § 1415(l) does not *create* a cause of action

13

under the IDEA. Instead, it merely recognizes the existence of other causes of action created by other statutes, and clarifies that the IDEA does not preclude plaintiffs from also pursuing remedies independently available under those statutes. Consequently, several courts have determined that there is no individual liability under the IDEA. *Blanchard v. Morton School District*, 2006 WL 2459167, at *2, 2006 U.S. Dist. LEXIS 59417, at *7 (W.D.Wash. August 23, 2006); *Colon*, 443 F.Supp.2d at 669; *M.T.V. v. Perdue*, 2004 WL 3826047, at *11, 2004 U.S. Dist. LEXIS 29670, at *37 (N.D.Ga. February 3, 2004); *P.N.*, 282 F.Supp.2d at 239. In other instances, courts have implied that there is no individual liability under the IDEA by suggesting that plaintiffs could circumvent the lack of such liability by suing under § 1983 for IDEA violations. *Weyrick v. New Albany-Floyd County Consolidated School Corporation*, 2004 WL 3059793, at *10, 2004 U.S. Dist. LEXIS 26435, at *32 (S.D.Ind. December 23, 2004)("Perhaps *the* principal difference between the IDEA remedies and the use of § 1983 is the potential for individual liability for damages from school district officials and employees.")(emphasis in original); *Doe v. Town of Framingham*, 965 F.Supp. 226, 230 (D.Mass. 1997)(declining to address the issue of individual liability under the IDEA because the plaintiff's suit was brought under § 1983 rather than directly under the IDEA). This Court is convinced that § 1415(l) creates no cause of action under the IDEA, but rather acknowledges that the same conduct which gives rise to an IDEA action can also give rise to an action under other sources of federal law. For this reason, the Court finds *Padilla*, as well as the decisions which employed its rationale, to be unpersuasive.

The ultimate inquiry, of course, does not end there. A determination that § 1415(l) does not provide for individual liability of the kind discussed in *Padilla* does not necessarily mean that no such liability exists under other provisions of the IDEA. Nevertheless, the courts which have found such

14

liability to exist have generally based individual liability on the very construction of § 1415(l) that this Court has rejected. *J.F.*, 2000 WL 361866, at \*18, 2000 U.S. Dist. LEXIS 4434, at \*54, 59; *Salisbury Township*, 1999 WL 562753, at \*4, 1999 U.S. Dist. LEXIS 11687, at \*10. The dispositive question is whether individual liability is a form of relief that is appropriate in light of the purposes of the IDEA.[3] *Bucks County Department of Mental Health/Mental Retardation v. Commonwealth of Pennsylvania*, 379 F.3d 61, 67 (3d Cir. 2004).

The IDEA is a comprehensive legislative scheme that was "intended to afford children with special needs an education that would confer meaningful benefit." *Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 184 (3d Cir. 1988). "Prior to the statute's enactment, many disabled children were completely excluded from any form of public education, while others were

---

[3] The "appropriate" relief standard is derived from the language of 20 U.S.C. § 1415(i)(2)(C)(iii), which gives a district court the authority to "grant such relief as the court determines is appropriate." This grant of jurisdiction presupposes that administrative procedures have been exhausted, and that there is a record for the district court to review. 20 U.S.C. § 1415(i)(2)(C). In this Motion to Dismiss, the Defendants do not appear to challenge this Court's subject matter jurisdiction on the ground that Taylor has failed to exhaust administrative remedies under the IDEA. In this circuit, the failure to exhaust such remedies is treated as a jurisdictional matter in the IDEA context. *Gutin v. Washington Township Board of Education*, 2007 WL 2139376, at \*2, 2007 U.S. Dist. LEXIS 53298, at \*7-8, n. 6 (D.N.J. July 23, 2007); *Joseph M. v. Northeastern Educational Intermediate Unit 19*, 2007 WL 1450314, at \*9-12, 2007 U.S. Dist. LEXIS 35785, at \*18 (M.D.Pa. May 15, 2007); *Falzetti v. The Pocono Mountain School District*, 150 F.Supp.2d 669, 701-702 (M.D.Pa. 2001). It is not clear to the Court whether Taylor exhausted administrative remedies in this case, or whether jurisdiction in this case could survive a failure to exhaust under these circumstances. *Hope v. Cortines*, 872 F.Supp. 14, 19-24 (E.D.N.Y. 1995). This jurisdictional issue, of course, must be addressed *sua sponte* by the Court. *Bender v. Williamsport Area School District*, 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501, 511 (1986). Nevertheless, since neither party has briefed this issue, the Court is once again handicapped in its efforts to conduct a meaningful IDEA analysis. *Taylor I*, 2006 U.S. Dist. LEXIS 70853, at \*54-63. Given the unclear state of the record, as well as the failure of the parties to address the question of whether Taylor's IDEA claims are even cognizable under these circumstances, the Court will not rule at this time on the question of subject matter jurisdiction. *Gutin v. Washington Township Board of Education*, 467 F.Supp.2d 414, 430 (D.N.J. 2006). In future filings, however, the parties should address this jurisdictional issue, as well as the question of whether exhaustion (if Taylor failed to exhaust administrative remedies) could be excused in this case on the ground of futility. *Jeremy H. v. Mount Lebanon School District*, 95 F.3d 272, 281-283 (3d Cir. 1996); *Bishop v. Oakstone Academy*, 477 F.Supp.2d 876, 882-884 (S.D.Ohio 2007). The Court's discussion about the IDEA in this opinion is limited to the question of whether Adams, Myers and Ritchey can be held liable as individuals under that statute. At this time, the Court expresses no opinion as to the effect that the language in 20 U.S.C. § 1415(l) concerning exhaustion may have on the Court's adjudicatory jurisdiction in this case. *Jeremy H.*, 95 F.3d at 281-283.

15

'sitting idly in regular classrooms awaiting the time when they were old enough to drop out.'" *Leighty v. Laurel School District*, 457 F.Supp.2d 546, 554 (W.D.Pa. 2006), quoting *Board of Education v. Rowley*, 458 U.S. 176, 191, 102 S.Ct. 3034, 3043, 73 L.Ed.2d 690, 702 (1982). The IDEA was enacted pursuant to Congress' authority under the Spending Clause, which undoubtedly informs the inquiry as to how it should be construed.

The substantive requirements contained in the IDEA come in the form of conditions placed on a State's receipt of federal funds. 20 U.S.C. § 1412(a). Similar obligations are placed on the applicable state educational agencies and local educational agencies. 20 U.S.C. §§ 1412(b), 1413. Most notably, the IDEA requires recipients of federal financial assistance to provide a "free appropriate public education" to all disabled children between the ages of 3 and 21. 20 U.S.C. § 1412(a)(1). To that end, recipients are required to develop, for each disabled child, an "individualized education program" designed to meet his or her unique educational needs. 20 U.S.C. § 1412(a)(4). The IDEA also conditions federal funding on a requirement that disabled children, to the extent possible, be educated with their nondisabled peers and not be unnecessarily excluded from the regular classroom (i.e., the IDEA's "mainstreaming" requirement). 20 U.S.C. § 1412(a)(5). The substantive obligations, of course, are imposed on the governmental entities receiving federal funds rather than on individuals employed by those entities.

The United States Court of Appeals for the Third Circuit has recognized that Congress does not normally seek to impose liability on individuals when it places conditions on the receipt of federal funds by entities that employ such individuals. *Emerson v. Thiel College*, 296 F.3d 184, 190 (3d Cir. 2002)("Because the individual defendants do not receive federal aid, Emerson does not state a claim

against them under the Rehabilitation Act."). This reality counsels against a determination that individuals can be held liable for IDEA violations. Spending Clause legislation is also subject to a particular rule of construction, which was recently explained by the United States Supreme Court in *Arlington Central School District v. Murphy*, 126 S.Ct. 2455, 165 L.Ed.2d 526 (2006):

> Congress has broad power to set the terms on which it disburses federal money to the States, but when Congress attaches conditions to a State's acceptance of federal funds, the conditions must be set out unambiguously[.] Legislation enacted pursuant to the spending power is much in the nature of a contract, and therefore, to be bound by federally imposed conditions, recipients of federal funds must accept them voluntarily and knowingly. States cannot knowingly accept conditions of which they are unable to ascertain. Thus, in the present case, we must view the IDEA from the perspective of a state official who is engaged in the process of deciding whether the State should accept IDEA funds and the obligations that go with those funds.

*Arlington Central*, 126 S.Ct. at 2459, 165 L.Ed.2d at 533-534 (citations and internal quotation marks omitted). The IDEA does not unambiguously impose individual liability on the employees of recipient entities. Indeed, the statutory obligations are imposed directly on the entities rather than on individuals. 20 U.S.C. § 1412(a). This interpretive rule, of course, is not directly applicable to statutory language that does not impose any substantive conditions or obligations on recipient entities that they "would not otherwise be required by law to observe." *Winkelman v. Parma City School District*, 127 S.Ct. 1994, 2006, 167 L.Ed.2d 904, 922 (2007). A legitimate argument could be made to the effect that the imposition of individual liability on the employees of recipient entities would not impose additional conditions or obligations on those entities, and that it would merely operate to expand the availability of remedies available to disabled children and their parents under the IDEA. Nevertheless, regardless of whether *Arlington Central*'s rule of construction compels the conclusion that there is no individual

17

liability under the IDEA, the Supreme Court's description of the IDEA as being *in the nature of a contract* between the Federal Government and States receiving IDEA funds informs the inquiry as to whether nonrecipients (i.e., *employees* of recipients) can be held liable under the statute.

Federal courts are courts of limited jurisdiction. *Lawrence Township Board of Education v. New Jersey*, 417 F.3d 368, 371 (3d Cir. 2005). It is for Congress, and not this Court, to create a private right of action to enforce federal law. "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Alexander v. Sandoval*, 532 U.S. 275, 286, 121 S.Ct. 1511, 1519, 149 L.Ed.2d 517, 528 (2001). There is no question that the IDEA provides both disabled students and their parents with private means of redress. *Winkelman*, 127 S.Ct. at 2002-2007, 167 L.Ed.2d at 918-923. It is the Court's view, however, that the statutory scheme contemplates that such redress will be pursued against the recipients of federal funds rather than against individuals employed by those recipients. The detailed remedial scheme established by the IDEA, which the United States Court of Appeals for the Third Circuit recently found to preclude a complementary remedy under § 1983, precludes an implied private right of action against *individuals* for the same reason.[4] *Jersey City*, 486 F.3d at 802-803. The Court expresses no opinion as to whether claims of the sort advanced in this case are cognizable under the IDEA, since the Defendants do not ask the Court to dismiss Count IV of the Amended Complaint, which asserts an

---

[4] The Court acknowledges that the courts within this circuit that have opined that no individual liability exists under the IDEA have generally done so within the context of explaining that such liability exists under § 1983. *Colon v. Colonial Intermediate Unit 20*, 443 F.Supp.2d 659, 669 (M.D.Pa. 2006); *P.N. v. Greco*, 282 F.Supp.2d 221, 239 (D.N.J. 2003). Nevertheless, this lack of individual liability directly under the IDEA was not dependent on the availability of a § 1983 remedy. The issues are distinct, and the determination by the Court of Appeals in *Jersey City* that IDEA violations are not actionable under § 1983 is no reason to judicially engraft onto the IDEA a remedy that Congress did not provide.

IDEA claim against the District. *Ortega v. Bibb County School District*, 397 F.3d 1321, 1324-1326 (11ᵗʰ Cir. 2005). At this point, it suffices to say that the IDEA's remedial scheme is inconsistent with Taylor's attempt to hold Adams, Myers and Ritchey individually liable for allegedly violating its provisions.

The Defendants, of course, have only moved for dismissal of Counts I, II and III on the ground that Adams, Myers and Ritchey are entitled to qualified immunity. (Document No. 21, pp. 7-8, ¶¶ 19-24). Nevertheless, the question of whether individual liability exists under the IDEA is inextricably intertwined with the qualified immunity inquiry. *Jersey City*, 486 F.3d at 795 ("In fact, we cannot imagine a qualified immunity inquiry involving statutory rights that does not include an inquiry into the availability of relief and the existence of a cause of action along with an inquiry into the existence of the violation itself."). It is not clear why the Defendants did not question the availability of individual liability under the IDEA. Perhaps they construed all of the IDEA claims to be brought under § 1983, which was permissible under the law of the circuit at the time that they filed their Motion to Dismiss. Given the intervening holding in *Jersey City* that IDEA violations are not actionable under § 1983, coupled with the Court's need to conduct a "threshold" inquiry into the availability of relief within the context of a qualified immunity determination, it is incumbent upon the Court to reach these issues. Having determined that the IDEA does not provide for individual liability, the Court will dismiss Counts I, II and III of the Amended Complaint. Moreover, the Court will dismiss Count XIII of the Amended Complaint, which is explicitly brought under § 1983, to the extent that it is based on alleged violations of the IDEA.

## B. The Rehabilitation Act Claims

19

Counts V, VI and VII assert claims under the Rehabilitation Act against Adams, Myers and Ritchey.[5] (Document No. 20-2, pp. 7-10, ¶¶ 121-142). In addition, Count XIII asserts claims under § 1983 against Adams, Myers, Ritchey and the District for alleged violations of the Rehabilitation Act. (*Id.*, pp. 15-16, ¶¶ 178-182).

In *Jersey City*, the United States Court of Appeals for the Third Circuit determined that violations of Section 504 of the Rehabilitation Act are not actionable under § 1983. *Jersey City*, 486 F.3d at 803-806. The Rehabilitation Act makes the "remedies, procedures and rights" set forth in Title VI of the Civil Rights Act of 1964 available to those whose rights thereunder are violated. 29 U.S.C. § 794a(a)(2). Title VI provides for the termination of federal funding if a covered entity fails to comply with its substantive provisions. 42 U.S.C. § 2000d-1. Although Title VI contains no express private right of action, the Supreme Court has found an implied right of action within it, which has been acknowledged by Congress in subsequent statutory amendments. *Barnes v. Gorman*, 536 U.S. 181, 185, 122 S.Ct. 2097, 2100, 153 L.Ed.2d 230, 236 (2002). Since Congress has incorporated Title VI's remedial scheme into the Rehabilitation Act, individuals have a private right of action under Section 504. *Three Rivers Center for Independent Living, Inc. v. Housing Authority of Pittsburgh*, 382 F.3d 412, 425-426 (3d Cir. 2004). The Court of Appeals, in *Jersey City*, concluded that this remedial scheme was sufficiently comprehensive to preclude § 1983 liability for violations of Section 504. *Jersey City*, 486 F.3d at 803-806. Accordingly, the Court will dismiss Count XIII of Taylor's Amended Complaint

---

[5] Count VIII is brought under the Rehabilitation Act against the District, but the Defendants do not seek the dismissal of that count. (Document No. 21, p. 2). Therefore, the Court's discussion of the Rehabilitation Act in this opinion is limited to the counts against Adams, Myers and Ritchey, as well as the Rehabilitation Act-based claims against the Defendants under § 1983. The Court expresses no opinion as to the merits of Count VIII.

to the extent that it is based on § 1983 for violations of Section 504.

Counts V, VI and VII are apparently brought directly under the Rehabilitation Act. (Document No. 20-2, pp. 7-10, ¶¶ 121-142). Section 504, in pertinent part, provides that "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. § 794(a). For purposes of the instant Motion to Dismiss, the parties do not dispute that Devin was a "qualified individual with a disability" and that the District received federal funding. Moreover, the question of whether Devin's rights under the Rehabilitation Act were violated is not presently at issue. The Defendants' sole basis for seeking the dismissal of Counts V, VI and VII is that individuals cannot be held liable for violations of the Rehabilitation Act. (Document No. 21, pp. 6-7, ¶¶ 14-18). Consequently, the Court's analysis is limited to that issue.

The United States Court of Appeals for the Third Circuit has stated, in general terms, that individual liability is not available under the Rehabilitation Act. *Jersey City*, 486 F.3d at 804 ("Suits may be brought pursuant to Section 504 against recipients of federal financial assistance, but not against individuals."). Like the IDEA, the Rehabilitation Act is Spending Clause legislation, and it must be construed accordingly. *Emerson v. Thiel College*, 296 F.3d 184, 190 (3d Cir. 2002)("Because the individual defendants do not receive federal aid, Emerson does not state a claim against them under the Rehabilitation Act."). Courts within this circuit have held that individuals cannot be held liable under the Rehabilitation Act. *Hajzus v. Peters Township School District*, 2007 WL 917082, at *2-3, 2007 U.S. Dist. LEXIS 20917, at *7 (W.D.Pa. March 23, 2007); *Haylett v. Bohrer*, 2006 WL 2372134, at *2,

2006 U.S. Dist. LEXIS 57463, at \*6 (W.D.Pa. August 15, 2006); *Zankel v. Temple University*, 2006 WL 1083600, at \*5, 2006 U.S. Dist. LEXIS 22473, at \*21 (E.D.Pa. April 24, 2006); *Arnold v. City of York*, 340 F.Supp.2d 550, 554 (M.D.Pa. 2004); *Calloway v. Boro of Glassboro Department of Police*, 89 F.Supp.2d 543, 557 (D.N.J. 2000); *Salisbury Township*, 1999 WL 562753, at \*4, 1999 U.S. Dist. LEXIS 11687, at \*10-11; *Fitzpatrick v. Pennsylvania*, 40 F.Supp.2d 631, 636-638 (E.D.Pa. 1999). Courts outside of this circuit have also held that there is no individual liability under the Rehabilitation Act. *Lollar v. Baker*, 196 F.3d 603, 608-609 (5th Cir. 1999); *Dukes v. Georgia*, 428 F.Supp.2d 1298, 1322, n. 5 (N.D.Ga. 2006); *Dunion v. Thomas*, 457 F.Supp.2d 119, 123 (D.Conn. 2006); *C.O. v. Portland Public Schools*, 406 F.Supp.2d 1157, 1172 (D.Or. 2005); *Murphy v. Board of Education*, 273 F.Supp.2d 292, 326 (W.D.N.Y. 2003); *Becker v. Oregon*, 170 F.Supp.2d 1061, 1066-1068 (D.Or. 2001); *Menes v. City University of New York*, 92 F.Supp.2d 294, 306 (S.D.N.Y. 2000); *Bracey v. Buchanan*, 55 F.Supp.2d 416, 420 (E.D.Va. 1999). Taylor attempts to circumvent this long line of authority by calling the Court's attention to the distinction between employment discrimination cases and public services (i.e., education) cases. (Document No. 24, pp. 4-5, ¶¶ 1-8). For this reason, a more extensive analysis is required.

Since Taylor's Amended Complaint alleges violations of Section 504, she is entitled to the "remedies, procedures, and rights" set forth in Title VI of the Civil Rights Act of 1964. 29 U.S.C. § 794a(a)(2). In support of her position, she relies on *McCachren v. Blacklick Valley School District*, 217 F.Supp.2d 594 (W.D.Pa. 2002). (Document No. 24, p. 5, ¶¶ 5-7). In *McCachren*, the Court distinguished between employment discrimination cases and public services cases under the Rehabilitation Act, concluding that earlier decisions holding that the Rehabilitation Act did not provide

22

for individual liability in employment discrimination cases were not persuasive with respect to public services cases. *McCachren*, 217 F.Supp.2d at 599-602. The Court based this distinction on the different remedies available in specific types of cases under the Rehabilitation Act. *Id.* Plaintiffs alleging that a form of employment discrimination violates the Rehabilitation Act proceed in accordance with the remedies contained in Title VII of the Civil Rights Act of 1964, while plaintiffs in other Section 504 actions proceed in accordance with the remedies contained in Title VI. 29 U.S.C. § 794a(a)(1)-(2). For this reason, in *McCachren*, the Court determined that the presumed unavailability of individual liability in employment discrimination cases under Title VII (which the Court acknowledged to be an open question in this circuit) did not necessitate a determination that there was no individual liability in other Section 504 cases, which are governed by Title VI. *McCachren*, 217 F.Supp.2d 594, 599-602.

This Court is unpersuaded by the reasoning in *McCachren*. The distinction between the remedies available under Title VII and those available under Title VI makes sense only if Title VI, unlike Title VII, provides for individual liability. *McCachren* did not address this issue at all, opting instead to deny the motion to dismiss because of a lack of authority on the issue. *Id.* at 602 ("Given the differences in statutory treatment of employment discrimination claims and other civil rights claims–and the complete lack [sic] relevant authority, as explained above–there is no basis for dismissing the Rehabilitation Act and ADA claims against the individual defendants."). In this case, the Court will take the analysis one step further. Most courts presented with the question of whether individual liability exists under Title VI have answered that question in the negative. *Shotz v. City of Plantation*, 344 F.3d 1161, 1170-1172 (11th Cir. 2003); *Gomiller v. Dees*, 2007 WL 1031359, at *3, 2007 U.S. Dist.

23

LEXIS 23230, at \*10-11 (N.D.Miss. March 28, 2007); *Thompson v. Blount Memorial Hospital, Inc.*, 2006 WL 3098787, at \*2-3, 2006 U.S. Dist. LEXIS 79216, at \*6-8 (E.D.Tenn. October 30, 2006); *Widmar v. City of Kansas City*, 2006 WL 743171, at \*2, 2006 U.S. Dist. LEXIS 26470, at \*6 (W.D.Mo. March 20, 2006); *Kelly v. Rice*, 375 F.Supp.2d 203, 208-209 (S.D.N.Y. 2005); *Jackson v. University of New Haven*, 228 F.Supp.2d 156, 158, n. 4 (D.Conn. 2002); *Jackson v. Waguespack*, 2002 WL 31427316, at \*2, 2002 U.S. Dist. LEXIS 20864, at \*17 (E.D.La. October 25, 2002); *Bayon v. State University of New York at Buffalo*, 2001 WL 135817, at \*2, 2001 U.S. Dist. LEXIS 1511, at \*6-7 (W.D.N.Y. February 14, 2001); *Powers v. CSX Transportation, Inc.*, 105 F.Supp.2d 1295, 1310-1312 (S.D.Ala. 2000); *Davis v. Flexman*, 109 F.Supp.2d 776, 791-795 (S.D.Ohio 1999). In *Emerson v. Thiel College*, 296 F.3d 184, 190 (3d Cir. 2002), the United States Court of Appeals for the Third Circuit noted that there is no individual liability under Title IX of the Educational Amendments of 1972, which is similar to Title VI. 20 U.S.C. § 1681(a); *Smith v. Metropolitan School District*, 128 F.3d 1014, 1018-1019 (7th Cir. 1997). The Court of Appeals also focused on the language contained in Section 504, which specifically defines the words "program or activity." *Emerson*, 296 F.3d at 190. This Court will do likewise.

Section 504 provides that "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. § 794(a). The statute defines the term "program or activity" as follows:

**(b) "Program or activity" defined.** For purposes of this section, the term "program

24

or activity" means all of the operations of--

    (1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or

    (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;

    (2)(A) a college, university, or other postsecondary institution, or a public system of higher education; or

    (B) a local educational agency (as defined in section 9101 of the Elementary and Secondary Education Act of 1965 [20 U.S.C. § 7801], system of vocational education, or other school system;

    (3)(A) an entire corporation, partnership, or other private organization, or an entire sole proprietorship--

        (i) if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole; or

        (ii) which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation; or

    (B) the entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation, partnership, private organization, or sole proprietorship; or

    (4) any other entity which is established by two or more of the entities described in paragraph (1), (2), or (3);

any part of which is extended Federal financial assistance.

29 U.S.C. § 794(b). This statutory language cannot reasonably be construed to include *individuals* such as Adams, Myers and Ritchey. *Davis*, 109 F.Supp.2d at 791-795. In *Emerson*, the Court of Appeals explained that "Section 504 applies to federal financial assistance *recipients*." *Emerson*, 296 F.3d at 190 (emphasis added). It is the District, and not the individual defendants, which receives federal financial assistance. Consequently, Adams, Myers and Ritchey cannot be held personally liable under the Rehabilitation Act. *Id.* ("It is undisputed that Thiel is the recipient of federal financial assistance. Because the individual defendants do not receive federal aid, Emerson does not state a claim against them under the Rehabilitation Act."). While both Taylor and *McCachren* identify a distinction between

25

employment discrimination cases and educational cases such as this, neither explains why this distinction should make a difference with respect to individual liability under Section 504. (Document No. 24, pp. 4-5, ¶¶ 1-8); *McCachren*, 217 F.Supp.2d at 599-602. Since the relevant statutory language and governing precedents indicate that the distinction identified by Taylor is a distinction without a difference for purposes of individual liability under Section 504, the Court will grant the Defendants' Motion to Dismiss with respect to Counts V, VI and VII of the Amended Complaint. (Document No. 20-2, pp. 7-10, ¶¶ 121-142). Count XIII will also be dismissed to the extent that it is brought under § 1983 for violations of the Rehabilitation Act. (*Id.*, pp. 15-16, ¶¶ 178-182).

## C. The Americans with Disabilities Act (ADA) Claims

Counts IX, X and XI of the Amended Complaint allege that Adams, Myers and Ritchey violated Title II of the ADA.[6] (Document No. 20-2, pp. 11-14, ¶¶ 150-170). The Defendants move for the dismissal of these counts on the ground that individuals cannot be held liable under the ADA. (Document No. 21, pp. 4-6, ¶¶ 8-13). Relying on *McCachren*, Taylor argues that individuals can be held liable under Title II of the ADA. (Document No. 24, pp. 3-4, ¶¶ 1-9).

Title II defines the term "public entity" to include, *inter alia*, "any State or local government[,]" as well as "any department, agency, special purpose district, or other instrumentality of a State or States or local government[.]" 42 U.S.C. § 12131(1)(A)-(B). The parties do not dispute that the District is a "public entity" for purposes of Title II. The term "qualified individual with a disability" is defined in Title II as "an individual with a disability who, with or without reasonable modifications to rules,

---

[6] Count XII alleges that the District violated Title II of the ADA. (Document No. 20-2, pp. 14-15, ¶¶ 171-177). That count is not the subject of the Defendants' Motion to Dismiss and, hence, will not be discussed in this memorandum opinion. (Document No. 21, pp. 2-15).

policies, or practices, the removal of architectural, communication, or transportation barriers, or the

provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of

services or the participation in programs or activities provided by a public entity." 42 U.S.C. §

12131(2). The parties do not dispute that Devin was a "qualified individual with a disability" under

Title II. The substantive provision of Title II provides:

### § 12132. Discrimination

Subject to the provisions of this title, no qualified individual with a disability shall, by
reason of such disability, be excluded from participation in or be denied the benefits of
the services, programs, or activities of a public entity, or be subjected to discrimination
by any such entity.

42 U.S.C. § 12132. Individuals alleging discrimination on the basis of disability under Title II may

invoke the "remedies, procedures, and rights" set forth in Section 505 of the Rehabilitation Act. 42

U.S.C. § 12133. Given that this is not an employment discrimination case, the applicable remedial

scheme under Section 505 is that contained in Title VI of the Civil Rights Act of 1964. 29 U.S.C. §

794a(a)(2).

As noted earlier, there is no individual liability under Title VI. *Shotz*, 344 F.3d at 1170-1172.

Consequently, Taylor cannot rely on the ADA's incorporation of Title VI to hold Adams, Myers and

Ritchey individually liable under Title II. Moreover, the statutory definition of the term "public entity"

cannot reasonably be construed to include individuals such as Adams, Myers and Ritchey. 42 U.S.C.

§ 12131(1)(A)-(C). Title II's substantive prohibition, of course, provides that no person such as Devin

"shall, by reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a *public entity*, or be subjected to discrimination *by* any such *entity*."

42 U.S.C. § 12132 (emphasis added). Even if one assumes that discrimination by an individual employed by a public entity can sometimes constitute discrimination *by* the public entity itself, it does not follow that the individual (as opposed to the public entity) is liable for the violation. Indeed, most of the courts in this circuit presented with this question have concluded that there is no individual liability under Title II. *Arnold v. City of York*, 2004 WL 2331781, at *7, 2004 U.S. Dist. LEXIS 21386, at *20 (M.D.Pa. June 28, 2004); *Wesley v. Vaughn*, 2003 WL 1493375, at *4, 2003 U.S. Dist. LEXIS 4434, at *21 (E.D.Pa. March 19, 2003); *Schorr v. Borough of Lemoyne*, 2002 U.S. Dist. LEXIS 25668, at *15 (M.D.Pa. December 27, 2002); *Doe v. Division of Youth & Family Services*, 148 F.Supp.2d 462, 489 (D.N.J. 2001); *Yeskey v. Pennsylvania Department of Corrections*, 76 F.Supp.2d 572, 574-575 (M.D.Pa. 1999). Several courts outside of this circuit have also held that no individual liability exists under Title II. *Garcia v. S.U.N.Y. Health Science Center of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001); *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005, n. 8 (8th Cir. 1999); *Fox v. State University of New York*, 2007 WL 2193925, at * 3, 2007 U.S. Dist. LEXIS 56924, at *7-8 (E.D.N.Y. July 23, 2007); *Hay v. Vance*, 2007 WL 1460814, at *2, 2007 U.S. Dist. LEXIS 35996, at *6-7 (E.D.Mo. May 16, 2007); *McElroy v. Department of Corrections*, 2007 WL 1345334, at *4, 2007 U.S. Dist. LEXIS 37279, at *8-12 (E.D.Cal. May 8, 2007); *Shebby v. Adams*, 2007 WL 1302744, at *8, 2007 U.S. Dist. LEXIS 32290, at *23-24 (E.D.Cal. May 2, 2007); *Delplato v. Meyerhoff*, 2007 WL 542009, at *1, 2007 U.S. Dist. LEXIS 11248, at *3-4 (W.D.N.Y. February 16, 2007); *Ross v. Knight*, 2006 WL 3626372, at *5, 2006 U.S. Dist. LEXIS 89794, at *13-14 (S.D.Ind. December 8, 2006); *Dunion v. Thomas*, 457 F.Supp.2d 119, 123 (D.Conn. 2006); *Marshall v. Green County*, 2006 WL 335829, at *4, 2006 U.S. Dist. LEXIS 5671, at *12-13 (W.D.Ky. February 13, 2006); *Carrasquillo v. City of New York*, 324 F.Supp.2d 428,

441-442 (S.D.N.Y. 2004); *Diggs v. Town of Manchester*, 303 F.Supp.2d 163, 175 (D.Conn. 2004);

*Valder v. City of Grand Forks*, 217 F.R.D. 491, 494 (D.N.D. 2003); *Bostick v. Elders*, 2003 WL

1193028, at *1, 2003 U.S. Dist. LEXIS 394, at *4-5 (N.D.Tex. January 10, 2003); *Doe v. Barger*, 193

F.Supp.2d 1112, 1116 (E.D.Ark. 2002); *Georgetown v. Tran*, 2002 U.S. Dist. LEXIS 8146, at *19-20

(E.D.La. January 11, 2002); *Key v. Grayson*, 163 F.Supp.2d 697, 714-715 (E.D.Mich. 2001); *Becker*

*v. Oregon*, 170 F.Supp.2d 1061, 1066 (D.Or. 2001); *Bayon v. State University of New York at Buffalo*,

2001 WL 135817, at *2, 2001 U.S. Dist. LEXIS 1511, at *5-6 (W.D.N.Y. February 14, 2001);

*Passanante v. R.Y. Management Co., Inc.*, 2001 WL 123858, at *4, 2001 U.S. Dist. LEXIS 1205, at

*12-13 (S.D.N.Y. February 9, 2001); *Berthelot v. Stadler*, 2000 WL 1568224, at *2, 2000 U.S. Dist.

LEXIS 15615, at *6-9 (E.D.La. October 18, 2000); *Thomas v. Nakatani*, 128 F.Supp.2d 684, 691-693

(D.Haw. 2000); *Shariff v. Artuz*, 2000 WL 1219381, at *5, 2000 U.S. Dist. LEXIS 12248, at *15-16

(S.D.N.Y. August 24, 2000); *Hallett v. New York State Department of Correctional Services*, 109

F.Supp.2d 190, 199-200 (S.D.N.Y. 2000); *Nucifora v. Bridgeport Board of Education*, 2000 WL

887650, at *2, 2000 U.S. Dist. LEXIS 9127, at *5-6 (D.Conn. May 23, 2000); *Montez v. Romer*, 32

F.Supp.2d 1235, 1240-1241 (D.Colo. 1999); *Smith v. University of New York*, 1997 WL 800882, at *7-

8, 1997 U.S. Dist. LEXIS 20782, at *19-25 (W.D.N.Y. December 30, 1997).

In an attempt to refute this long line of persuasive authority, Taylor relies on *McCachren* for the

proposition that individual liability exists under Title II of the ADA.[7] (Document No. 24, pp. 3-4, ¶¶

---

[7] Taylor does not seek prospective injunctive relief, but rather declaratory relief and compensatory damages. (Document No. 20-2, pp. 23-24). For this reason, the Court has no occasion to consider the extent to which an individual defendant such as Adams, Myers or Ritchey could be sued for prospective relief for violating Title II of the ADA. *Koslow v. Commonwealth of Pennsylvania*, 302 F.3d 161, 178 (3d Cir. 2002).

5-7). As noted earlier, however, this Court finds the reasoning in *McCachren* to be unpersuasive. Taylor contends that *McCachren* held that "discrimination claims brought pursuant to Title II of the ADA allow for individual liability." (Document No. 24, p. 3, ¶ 5). The Court is not even convinced that *McCachren* went that far. It appears that *McCachren* declined to make a determination one way or the other because of a perceived lack of authority on this issue. *McCachren*, 217 F.Supp.2d at 602 ("Given the differences in statutory treatment of employment discrimination claims and other civil rights claims–and the complete lack [of] relevant authority, as explained above–there is no basis for dismissing the Rehabilitation Act and ADA claims against the individual defendants."). The problem with Taylor's argument is that it begs the question. Although she argues that Title II is different from Title I, she makes no attempt to explain why this difference calls for a different result with respect to individual liability. (Document No. 24, pp. 3-4, ¶¶ 1-9).

The Defendants rely on *Emerson* for the proposition that there is no individual liability under the ADA. (Document No. 21, p. 5, ¶¶ 11-12). Taylor attempts to distinguish *Emerson* on the ground that it involved a construction of Title III of the ADA, while this case involves a construction of Title II. (Document No. 24, p. 3, ¶ 3). Given the statutory language of Title III, however, it is difficult to fathom how Taylor believes that the difference between Title II and Title III helps her argument more than it hurts it. The applicable statutory language in Title III provides:

**§ 12182. Prohibition of discrimination by public accommodations**

**(a) General rule.** No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation *by any person* who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182 (emphasis added). Unlike Title II's provisions, Title III's substantive prohibition applies to any *person* who owns, leases or operates a place of public accommodation. Title II only prohibits discrimination by a *public entity*. 42 U.S.C. § 12132. The difference in statutory language indicates that the availability of individual liability under Title II is actually *less likely* than the availability of individual liability under Title III. 42 U.S.C. § 12132 (". . . or be subjected to discrimination by any such *entity*.")(emphasis added); 42 U.S.C. § 12282 (". . . by any *person* who owns, leases (or leases to), or operates a place of public accommodation.")(emphasis added). In *Emerson*, the Court of Appeals indicated that individual liability was available under Title III in certain instances. *Emerson*, 296 F.3d at 189 ("Thus, the individual college defendants and Brown may be liable under Title III if they own, lease or operate Thiel, a place of public accommodation."). Individual liability was lacking in that case only because the particular defendants did not fall within the sweep of Title III's statutory language. *Id.* ("Applying these definitions, we hold that the individual college defendants and Brown do not operate Thiel and thus are not subject to individual liability under Title III of the ADA."). If anything, *Emerson* indicates that the distinction between Title II and Title III, upon which Taylor purports to rely, only serves to reinforce the rationale of the courts which have determined that there is no individual liability under Title II.[8] Accordingly, the Court will grant the Defendants'

---

[8] The ADA's retaliation provision provides: "No *person* shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act." 42 U.S.C. § 12203(a). The statute's use of the word "person" has led some courts to conclude that individuals can be held liable under the ADA for retaliation. *Key v. Grayson*, 163 F.Supp.2d 697, 716-717 (E.D.Mich. 2001); *Smith v. University of New York*, 1997 WL 800882, at *8, 1997 U.S. Dist. LEXIS 20782, at *24-26 (W.D.N.Y. December 30, 1997); *Ostrach v. Regents of the University of California*, 957 F.Supp. 196, 200-201 (E.D.Cal. 1997). This case, of course, does not involve a retaliation claim, making it unnecessary for the Court to consider the question of whether the ADA's retaliation provision provides for individual liability. In any event, however, the case for individual liability is much stronger when a statute imposes substantive obligations on individuals rather than on entities. Since Title II applies to *public entities* rather than to *persons*,

Motion to Dismiss with respect to Counts IX, X and XI of the Amended Complaint. Title II does not provide for individual liability, and Taylor cannot proceed thereunder against Adams, Myers and Ritchey in their personal capacities.

The unavailability of individual liability directly under Title II, of course, is not dispositive of Count XIII. In Count XIII, Taylor attempts to sue the Defendants under § 1983 for violating the ADA. (Document No. 20-2, pp. 15-16, ¶¶ 178-182). Most of the courts presented with such a claim have concluded that § 1983 may not be used to remedy violations of the ADA, which contains its own remedial scheme. *Vinson v. Thomas*, 288 F.3d 1145, 1155-1156 (9th Cir. 2002); *Pona v. Cecil Whittaker's, Inc.*, 155 F.3d 1034, 1037-1038 (8th Cir. 1998); *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1530-1531 (11th Cir. 1997); *Davis v. Francis Howell School District*, 104 F.3d 204, 206 (8th Cir. 1997); *Metzgar v. Lehigh Valley Housing Authority*, 1999 WL 562756, at *3-5, 1999 U.S. Dist. LEXIS 11908, at *10-15 (E.D.Pa. July 27, 1999); *Martell v. Estado Libre Asociado De Puerto Rico*, 48 F.Supp.2d 81, 89-91 (D.P.R. 1999); *Kagan v. Nevada*, 35 F.Supp.2d 771, 772-773 (D.Nev. 1999); *Houck v. City of Prairie Village*, 978 F.Supp. 1397, 1404-1405 (D.Kan. 1997); *Krocka v. Bransfield*, 969 F.Supp. 1073, 1089-1090 (N.D.Ill. 1997). Nevertheless, in *P.N. v. Greco*, 282 F.Supp.2d 221, 242-244 (D.N.J. 2003), the United States District Court for the District of New Jersey concluded that the ADA's remedial scheme was not sufficiently comprehensive to preclude § 1983 liability for violations of that statute. That decision, however, was issued prior to the decision of the United States Supreme Court in *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 125 S.Ct. 1453, 161 L.Ed.2d 316

---

there is no merit to Taylor's argument that Title II has unique features which warrant a determination that individual liability can be imposed thereunder. (Document No. 24, pp. 3-4, ¶¶ 2-7).

(2005).

In *Rancho Palos Verdes*, the Supreme Court explained the analytical framework needed to determine whether a federal statutory violation is actionable under § 1983. Section 1983, after all, permits the enforcement of *rights*, not the broader categories of *benefits* or *interests*. *Gonzaga University v. Doe*, 536 U.S. 273, 283, 153 L.Ed.2d 309, 122 S.Ct. 2268 (2002). For this reason, "§ 1983 does not provide an avenue for relief every time a state actor violates a federal law." *Rancho Palos Verdes*, 544 U.S. at 119, 125 S.Ct. at 1458, 161 L.Ed.2d at 325. In order to sustain an action under § 1983 for a federal statutory violation, "the plaintiff must demonstrate that the federal statute creates an individually enforceable right in the class of beneficiaries to which he belongs." *Rancho Palos Verdes*, 544 U.S. at 120, 125 S.Ct. at 1458, 161 L.Ed.2d at 325. If the plaintiff succeeds in making such a showing, there is a rebuttable presumption that the applicable federal statutory right is enforceable under § 1983. *Blessing v. Freestone*, 520 U.S. 329, 341, 117 S.Ct. 1353,1360, 137 L.Ed.2d 569, 582 (1997). This presumption is defeated if the defendant is able to demonstrate that Congress did not intend for § 1983 to be available as a remedy for a newly created statutory right. *Rancho Palos Verdes*, 544 U.S. at 120, 125 S.Ct. at 1458, 161 L.Ed.2d at 325. Evidence of such congressional intent may be found directly in the federal statute creating the right which the plaintiff seeks to enforce. *Id.* Alternatively, evidence of congressional intent to foreclose § 1983 liability for a federal statutory violation may be inferred from the statute's creation of its own comprehensive remedial scheme. *Id.* The ultimate question, of course, is whether Congress intended for § 1983 to be available to redress violations of the applicable statutory right.

Title II of the ADA has its own enforcement mechanism. The statute specifically incorporates

33

the "remedies, procedures, and rights" set forth in Section 505 of the Rehabilitation Act. 42 U.S.C. §
12133. Since this is not an employment discrimination case, the applicable remedies available under
Section 505 are those contained in Title VI of the Civil Rights Act of 1964. 29 U.S.C. § 794a(a)(2).
In *Rancho Palos Verdes*, the Supreme Court explained that "[t]he provision of an express, private
means of redress in the statute itself is ordinarily an indication that Congress did not intend to leave
open a more expansive remedy under § 1983." *Rancho Palos Verdes*, 544 U.S. at 121, 125 S.Ct. at
1458, 161 L.Ed.2d at 326. This is because "[t]he express provision of one method of enforcing a
substantive rule suggests that Congress intended to preclude others." *Alexander v. Sandoval*, 532 U.S.
275, 290, 121 S.Ct. 1511, 1521-1522, 149 L.Ed.2d 517, 531 (2001). Moreover, in *Jersey City*, the
United States Court of Appeals for the Third Circuit concluded that Section 504's remedial scheme,
which incorporates the implied private right of action available under Title VI, was sufficiently
comprehensive to preclude a complementary remedy under § 1983. *Jersey City*, 486 F.3d at 803-806.
Since that same remedial scheme is incorporated within Title II of the ADA, the Court is convinced that
*Jersey City* controls the question of § 1983 liability under Title II of the ADA, thereby precluding
reliance on § 1983 as a basis for remedying violations of Title II. Accordingly, Taylor cannot sue under
§ 1983 for violations of Title II of the ADA, and the Court will dismiss Count XIII of the Amended
Complaint to the extent that it is based on violations of Title II.

## D. The Fourteenth Amendment Claims

Counts XIV, XV, XVI and XVII allege that Adams, Myers, Ritchey and the District violated
Devin's rights under the Due Process Clause of the Fourteenth Amendment. (Document No. 20-2, pp.
16-22, ¶¶ 183-221). In Count XVIII, Taylor alleges that the Defendants violated *her* rights under the

34

Fourteenth Amendment by depriving her of Devin's "consortium, love and support[.]" (*Id.*, p. 22, ¶¶

222-224). The Defendants move for the dismissal of these counts on the ground that Taylor fails to

state a claim upon which relief can be granted within the meaning of *Federal Rule of Civil Procedure*

*12(b)(6).*[9] (Document No. 21, pp. 8-10, ¶¶ 25-32).

Section 1 of the Fourteenth Amendment provides:

All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. CONST., amend. XIV, § 1. Section 5 of the Fourteenth Amendment gives Congress the power

to enforce, "by appropriate legislation," the substantive provisions contained in § 1. U.S. CONST.,

amend. XIV, § 5. In order to provide a remedy for violations of the Fourteenth Amendment, Congress

has enacted § 1983, which provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer

---

[9] In support of their Motion to Dismiss the Amended Complaint, the Defendants incorporate by reference the brief that they filed in support of their first Motion to Dismiss, which was granted in part last year. (Document No. 21, p. 4, ¶ 7). In *Taylor I*, the Court explained why the allegations contained in Taylor's original complaint did not state a claim for a violation of the Fourteenth Amendment. *Taylor v. Altoona Area School District*, 2006 U.S. Dist. LEXIS 70853, at *11-50 (W.D.Pa. September 28, 2006). Given the earlier discussion in *Taylor I*, there is no need for the Court to address each argument contained in the original briefs filed by the parties in this case. Consequently, the Court's discussion in this opinion focuses on the issues raised in the Defendants' Motion to Dismiss the Amended Complaint, with an emphasis on material differences between the original complaint that was dismissed in part last year and the Amended Complaint that is currently before the Court.

for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983. Section 1983 does not create substantive rights. *Maher v. Gagne*, 448 U.S. 122, 129, 100 S.Ct. 2570, 2574, 65 L.Ed.2d 653, 661, n. 11 (1980). Consequently, a plaintiff cannot prevail in an action brought under § 1983 without establishing an underlying violation of federal law.

Since this matter comes before the Court on the Defendants' Motion to Dismiss, the Court must accept all factual allegations as true, construe the Amended Complaint in the light most favorable to Taylor, and determine whether, under *any reasonable reading* of the Amended Complaint, Taylor may be entitled to relief. *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374, n. 7 (3d Cir. 2002). At the outset, it is worth noting that § 1983 "contains no state-of-mind requirement independent of that necessary to state a violation of the underlying constitutional right." *Daniels v. Williams*, 474 U.S. 327, 330, 106 S.Ct. 662, 664, 88 L.Ed.2d 662, 667 (1986). Therefore, the only state-of-mind requirement relevant to Taylor's § 1983 claims is that required to establish an underlying violation of the Fourteenth Amendment. As in any case brought under § 1983, the Court must proceed to "identify the exact contours of the underlying right said to have been violated." *County of Sacramento v. Lewis*, 523 U.S. 833, 842, 118 S.Ct. 1708, 1714, 140 L.Ed.2d 1043, 1055, n. 5 (1998).

The Amended Complaint makes it clear that Taylor seeks to proceed against the Defendants on the basis of substantive due process claims. (Document No. 20-2, pp. 16-22, ¶¶ 183-224). The Supreme Court "has always been reluctant to expand the concept of substantive due process because

36

guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261, 273 (1992). Substantive due process claims against executive officials are analyzed differently than substantive due process challenges to legislative enactments. As the Supreme Court explained in *County of Sacramento v. Lewis*, 523 U.S. 833, 847, 118 S.Ct. 1708, 1717, 140 L.Ed.2d 1043, 1058, n. 8 (1998), "in a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." The conscience-shocking concept "duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability." *Lewis*, 523 U.S. at 848, 118 S.Ct. at 1717, 140 L.Ed.2d at 1058-1059. At one end of the spectrum is negligence, which is categorically insufficient to constitute conscience-shocking conduct for purposes of the Due Process Clause. *Daniels*, 474 U.S. at 332, 106 S.Ct. at 665, 88 L.Ed.2d at 668 ("Far from an abuse of power, lack of due care suggests no more than a failure to measure up to the conduct of a reasonable person. To hold that injury caused by such conduct is a deprivation within the meaning of the Fourteenth Amendment would trivialize the centuries-old principle of due process of law."); *Davidson v. Cannon*, 474 U.S. 344, 348, 106 S.Ct. 668, 670, 88 L.Ed.2d 677, 683 (1986)("The guarantee of due process has never been understood to mean that the State must guarantee due care on the part of its officials."). At the other end of the spectrum is conduct intended to cause unwarranted injury, which is very likely to constitute consicence-shocking conduct. *Lewis*, 523 U.S. at 849, 118 S.Ct. at 1718, 140 L.Ed.2d at 1059 ("It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct

Case 3:05-cv-00350-KRG Document 26 Filed 08/23/07 Page 38 of 60

intended to injure in some way unjustifiable by any governmental interest is the sort of official action most likely to rise to the conscience-shocking level."). "Whether the point of the conscience-shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence, is a matter for closer calls." *Id.* (internal citation and internal quotation marks omitted).

This case, like most cases alleging that an executive action violates the Due Process Clause, necessitates some close calls. The Court's analysis begins with *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 191, 109 S.Ct. 998, 1001, 103 L.Ed.2d 249, 256 (1989), in which the Supreme Court held that local officials did not violate the rights of a minor child under the Due Process Clause when they failed to remove him from the custody of his abusive father, even though they had received complaints of the abuse and had reason to know that it was going on. The Supreme Court explained that the Due Process Clause "forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but [that] its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *DeShaney*, 489 U.S. at 195, 109 S.Ct. at 1003, 103 L.Ed.2d at 259. The Due Process Clause confers "no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney*, 489 U.S. at 196, 109 S.Ct. at 1003, 103 L.Ed.2d at 259.

The Supreme Court recognized an exception to this general rule, stating that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney*,

38

489 U.S. at 199-200, 109 S.Ct. at 1005, 103 L.Ed.2d at 261. In so observing, the Supreme Court cited

prior decisions involving the Cruel and Unusual Punishment Clause of the Eighth Amendment and the

Due Process Clause of the Fourteenth Amendment. *Youngberg v. Romeo*, 457 U.S. 307 (1982); *Estelle*

*v. Gamble*, 429 U.S. 97 (1976). Since Devin was not being *punished* by the State at the time of his

tragic death, the Cruel and Unusual Punishment Clause is clearly inapplicable to this case. Moreover,

as this Court explained in *Taylor I*, Devin was not held *against his will* at Wright at the time of his

death, since Taylor was free to take him home whenever she determined that his health so required.

*Taylor I*, 2006 U.S. Dist. LEXIS 70853, at *39-41. The Pennsylvania Supreme Court has recognized

the right of a parent to take her child out of a school in order to protect the child's health and welfare.

*Zebra v. Pittsburgh School District*, 296 A.2d 748, 751 (Pa. 1972). The United States Court of Appeals

for the Third Circuit has rejected the notion that the school environment constitutes the sort of detention

recognized by the Supreme Court in *DeShaney*. *Black v. Indiana Area School District*, 985 F.2d 707,

713-714 (3d Cir. 1993). In *D.R. v. Middle Bucks Area Vocational Technical School*, 972 F.2d 1364,

1372 (3d Cir. 1992), the Court of Appeals explained:

> By requiring D.R. to attend assigned classes at Middle Bucks as part of her high school
> educational program, and authorizing officials to engage in disciplinary control over the
> students, the school defendants did not restrict D.R.'s freedom to the extent that she was
> prevented from meeting her basic needs. Thus, the school defendants' authority over
> D.R. during the school day cannot be said to create the type of physical custody
> necessary to bring it within the special relationship noted in *DeShaney*, particularly
> when their channels for outside communication were not totally closed.

Devin was not detained for purposes of the custodial relationship recognized in *DeShaney*.

Consequently, the Defendants had no *constitutional* duty to come to his aid. *DeShaney*, 489 U.S. at

200, 109 S.Ct. at 1005-1006, 103 L.Ed.2d at 262 ("The affirmative duty to protect arises not from the

State's knowledge of the individual's predicament or from its expressions of intent to help him, but

from the limitation which it has imposed on his freedom to act on his own behalf.").

> The analysis, of course, does not end there. In *DeShaney*, the Supreme Court observed:

> While the State may have been aware of the dangers that Joshua faced in the free world,
> it played no part in their creation, nor did it do anything to render him any more
> vulnerable to them. That the State once took temporary custody of Joshua does not alter
> the analysis, for when it returned him to his father's custody, it placed him in no worse
> position than that in which he would have been had it not acted at all; the State does not
> become the permanent guarantor of an individual's safety by having once offered him
> shelter. Under these circumstances, the State had no constitutional duty to protect
> Joshua.

*DeShaney*, 489 U.S. at 201, 109 S.Ct. at 1006, 103 L.Ed.2d at 262-263. This language implies that

where a State does *play a part in the creation* of the dangers faced by a private individual, or where a

State, through its actions, renders an individual *more vulnerable* to those dangers, an affirmative

*constitutional duty to protect* that individual may arise. In *Kneipp v. Tedder*, 95 F.3d 1199, 1205 (3d

Cir. 1996), the Court of Appeals relied on this language in *DeShaney* to recognize that a plaintiff

alleging a substantive due process violation could proceed in accordance with such a "state-created

danger" theory. *Kneipp*, 95 F.3d at 1209 ("Finally, there is sufficient evidence in the summary

judgment record to show that Officer Tedder and the other police officers used their authority as police

officers to create a dangerous situation or to make Samantha more vulnerable to danger had they not

intervened.").

In order to state a substantive due process claim pursuant to the state-created danger doctrine,

a plaintiff must show that: (1) the harm ultimately caused was foreseeable and fairly direct; (2) a state

actor acted with a degree of culpability that shocks the conscience;[10] (3) a relationship between the State and the plaintiff existed such that the plaintiff was a foreseeable victim of the harm ultimately caused, or a member of a discrete class of persons subjected to the potential harm brought about by the State's actions, as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the plaintiff, or that rendered the plaintiff more vulnerable to danger than had the State not acted at all. *Bright v. Westmoreland County*, 443 F.3d 276, 281 (3d Cir. 2006). Accepting the allegations in the Amended Complaint as true, as the Court must for purposes of the instant Motion to Dismiss, it is clear that Taylor has satisfied the first and third elements. She

---

[10] In *Kneipp v. Tedder*, 95 F.3d 1199, 1208 (3d Cir. 1996), the United States Court of Appeals for the Third Circuit stated the second element as requiring a showing that "the state actor acted in willful disregard for the safety of the plaintiff[.]" *Kneipp* was decided before *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). In *Lewis*, the Supreme Court explained that "the substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Lewis*, 523 U.S. at 847, 118 S.Ct. at 1717, 140 L.Ed.2d at 1058 (internal quotation marks omitted). Consequently, the second element applicable to *Kneipp*'s "state-created danger" theory has been modified to incorporate the Supreme Court's subsequent decision in *Lewis*. The Court acknowledges that there has been some confusion in this circuit as to this standard, since the Court of Appeals apparently confused the general test for determining whether executive action violates the Due Process Clause (i.e., the conscience-shocking test) with the varying levels of culpability needed to reach the conscience-shocking threshold in *Brown v. Pennsylvania Department of Health Emergency Medical Services Training Institute*, 318 F.3d 473 (3d Cir. 2003). The panel mistakenly believed that the conscience-shocking threshold was itself a level of culpability on the tort spectrum, rather than the more generalized substantive due process test that the Supreme Court intended it to be. Compare *Lewis*, 523 U.S. at 850, 118 S.Ct. at 1718, 140 L.Ed.2d at 1060 ("Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience-shocking."), with *Brown*, 318 F.3d at 480 ("We now hold that the same 'conscience shocking' standard applies to the actions of emergency medical personnel who likewise have little time for reflection, typically making decisions in haste and under pressure."). Nevertheless, the Court of Appeals has now recognized, and corrected, the analytical error that had been made in *Brown. Sanford v. Stiles*, 456 F.3d 298, 305 (3d Cir. 2006)("The Court held that *generally*, in a due process challenge to executive action, the threshold question is whether the government officer's actions 'shock the contemporary conscience.'")(emphasis added). Another court in this circuit recently observed that the analysis in *Brown* had confused these principles, and that later decisions of the Court of Appeals had essentially abandoned *Brown*'s flawed analysis in favor of a proper application of *Lewis. Estate of Soberal v. City of Jersey City*, 2006 WL 2085397, at *7, 2006 U.S. Dist. LEXIS 50691, at *25, n. 11 (D.N.J. July 24, 2006)("The *Brown* court's use of the term "shocks the conscience" appears to be at odds with the use of that term in later Third Circuit cases."). Accordingly, this Court proceeds in accordance with the later decisions of the Court of Appeals, which correctly apply *Lewis. Sanford*, 456 F.3d at 310 ("We again clarify that in *any* state-created danger case, the state actor's behavior must *always* shock the conscience.")(emphasis in original).

41

alleges that the Defendants had knowledge of Devin's asthma and breathing problems, that an IEP had been developed for Devin to address these impairments, and that a Service Plan had been instituted pursuant to the IEP to provide the appropriate services to Devin while he was at school. (Document No. 20, pp. 6-7, ¶¶ 28-30). Taylor also alleges that the Defendants had been made aware of Devin's January 2003 hospitalization, which necessitated his absence from school. (*Id.*, p. 9, ¶¶ 38-39). Thus, the harm which ultimately befell Devin (i.e., his death from asthma-related breathing problems) was both *foreseeable* and *fairly direct*. Moreover, the fact that Devin had been identified as a disabled child, and given an IEP to address his disability, placed him within a *discrete class of persons* potentially subjected to harm as a result of the Defendants' actions. The second and fourth elements, however, require a more detailed examination.

In *DeShaney*, the Supreme Court did not address the level of culpability associated with a violation of the Due Process Clause, since the State had no affirmative duty to act in that case. *DeShaney*, 489 U.S. at 202, 109 S.Ct. at 1007, 103 L.Ed.2d at 263, n. 10 ("Because we conclude that the Due Process Clause did not require the State to protect Joshua from his father, we need not address respondents' alternative argument that the individual state actors lacked the requisite 'state of mind' to make out a due process violation."). In a state-created danger case such as this, however, an affirmative duty to act may arise from affirmative actions by the State which create dangers that would otherwise not exist, or which make an individual more vulnerable to preexisting dangers than he or she would be without any action by the State. *DeShaney*, 489 U.S. at 201, 109 S.Ct. at 1006, 103 L.Ed.2d at 262 ("While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them."). Although

42

the Supreme Court has not specifically recognized the state-created danger theory for purposes of substantive due process analysis, a majority of the courts of appeals have adopted some variation of it. *Sanford v. Stiles*, 456 F.3d 298, 304 (3d Cir. 2006); *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006); *Pena v. Deprisco*, 432 F.3d 98, 107-110 (2d Cir. 2005); *Forrester v. Bass*, 397 F.3d 1047, 1057-1059 (8th Cir. 2005); *Butera v. District of Columbia*, 235 F.3d 637, 648-651 (D.C.Cir. 2001); *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998); *Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995); *Reed v. Gardner*, 986 F.2d 1122, 1126 (7th Cir. 1993). Since the United States Court of Appeals for the Third Circuit adopted the state-created danger theory in *Kneipp*, the Court will proceed to analyze the applicable culpability standard required to reach the conscience-shocking threshold under the circumstances of this case.

In *Taylor I*, the Court identified "subjective deliberate indifference" as the minimal standard necessary to reach the conscience-shocking threshold during the period of time prior to the onset of a medical emergency (i.e., before Myers was aware of the fact that Devin had stopped breathing, and that he was turning purple).[11] *Taylor I*, 2006 U.S. Dist. LEXIS 70853, at *34-36. This standard has its

---

[11] The Court did not actually hold that subjective deliberate indifference was sufficient to reach the conscience-shocking threshold under these circumstances. Instead, the Court determined that anything less than subjective deliberate indifference would be insufficient, assuming *arguendo* that subjective deliberate indifference would suffice. *Taylor v. Altoona Area School District*, 2006 U.S. Dist. LEXIS 70853, at *30-31 (W.D.Pa. September 28, 2006)("It is unclear whether a subjective showing of deliberate indifference would be sufficient for establishing a violation of the Due Process Clause under these circumstances, since the actual inquiry is whether Taylor's complaint alleges conscience-shocking conduct."). The Court's assumption was based on language in *Kaucher v. County of Bucks*, 455 F.3d 418, 428, n. 5 (3d Cir. 2006), expressing approval of a subjective deliberate indifference standard in substantive due process cases involving governmental actions which expose individuals to increased health risks. *Taylor I*, 2006 U.S. Dist. LEXIS 70853, at *30. The only definitive determination that the Court made in *Taylor I* with respect to the applicable level of culpability prior to the onset of Devin's medical emergency was that objective deliberate indifference was insufficient to establish a conscience-shocking level of culpability. *Taylor I*, 2006 U.S. Dist. LEXIS 70853, at *30 ("For this reason, the Court is convinced that the application of an objective deliberate indifference standard would be inappropriate in the present case.").

43

genesis in *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811, 825 (1994), in which the Supreme Court declared that "a prison official cannot be liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Although the Court, in *Taylor I*, assumed *arguendo* (without expressly holding) that subjective deliberate indifference on the part of the Defendants prior to Devin's medical emergency was sufficient to satisfy the conscience-shocking threshold, the Court now expressly holds that this is the applicable level of culpability necessary to establish that the Defendants' conduct was conscience-shocking during the period of time preceding Devin's lapse in consciousness. In so holding, the Court is guided by *Kaucher v. County of Bucks*, 455 F.3d 418, 428, n. 5 (3d Cir. 2006), in which the Court of Appeals expressed its approval for the application of a subjective deliberate indifference standard in substantive due process cases such as this.

A subjective showing of deliberate indifference, however, is generally insufficient to satisfy the conscience-shocking threshold within the context of a medical emergency. For this reason, the Court concluded in *Taylor I* that the period of time subsequent to Myers' realization that Devin had stopped breathing needed to be evaluated under a different culpability standard. *Taylor I*, 2006 U.S. Dist. LEXIS 70853, at *32 ("When it became apparent that Devin was in imminent danger, the situation gravitated closer to an emergency situation akin to that in *Lewis*, in which there was little or no time for actual *deliberation*.")(emphasis in original). The Court of Appeals has recognized that, within the context of a medical emergency, something less than an intent to harm can constitute a conscience-

44

shocking level of culpability. *Miller v. City of Philadelphia*, 174 F.3d 368, 375 (3d Cir. 1999). In such a situation, state or local government officials act with a conscience-shocking level of culpability if they consciously disregard not just a substantial risk, but a *great risk* that *serious* harm to an individual will result from their actions. *Sanford v. Stiles*, 456 F.3d 298, 310 (3d Cir. 2006)("In conclusion, we hold that in a state-created danger case, when a state actor is not confronted with a 'hyperpressurized environment' but nonetheless does not have the luxury of proceeding in a deliberate fashion, the relevant question is whether the officer consciously disregarded a great risk of harm."); *Rivas v. City of Passaic*, 365 F.3d 181, 196 (3d Cir. 2004)("A jury could find, based on this version of events, that Garcia and Rodriguez consciously disregarded a great risk of serious harm to Mr. Rivas by misrepresenting the assault and then abandoning Mr. Rivas to the police, particularly since EMTs are supposed to render aid to those in need of medical assistance."); *Ziccardi v. City of Philadelphia*, 288 F.3d 57, 66 (3d Cir. 2002)("In summary, then, we understand *Miller* to require in a case such as the one before us, proof that the defendants consciously disregarded, not just a substantial risk, but a great risk that serious harm would result if, knowing Smith was seriously injured, they moved Smith without support for his back and neck."). Hence, in order to show that the Defendants acted with a conscience-shocking level of culpability after learning that Devin had stopped breathing, Taylor must establish that they acted with a *conscious disregard* as to whether their actions exposed Devin to a *great risk* of *serious harm*. *Taylor I*, 2006 U.S. Dist. LEXIS 70853, at *32-33. The Court's "state-created danger" inquiry proceeds with these culpability standards in mind.

With respect to the fourth element, Taylor must allege that *affirmative acts* on the part of the Defendants worked to Devin's detriment in terms of his exposure to health-related dangers. *Bright*, 443

F.3d at 282. After all, "[i]t is misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause." *Id.* In *Taylor I*, the Court noted that Taylor's substantive due process arguments were problematic, since they were focused almost exclusively on omissions rather than on affirmative acts. *Taylor I*, 2006 U.S. Dist. LEXIS 70853, at *45 ("Taylor's complaint alleges no affirmative act on the part of the Defendants which contributed to Devin's death. Instead, it alleges a long series of omissions."). The Court of Appeals has "never found a state-created danger claim to be meritorious without an allegation and subsequent showing that state authority was affirmatively exercised." *Bright*, 443 F.3d at 282.

Before addressing the specific allegations against Adams, Myers and Ritchey, the Court notes the Defendants' argument that these three individuals cannot be held liable if no action lies against the "entity" (i.e., the District). (Document No. 21, p. 10, ¶ 31). This argument is simply wrong. To establish personal liability in a § 1983 action, it is enough for a plaintiff to show that "the official, acting under color of state law, caused the deprivation of a federal right." *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114, 122 (1985). To hold a municipality liable under § 1983, however, a plaintiff must "demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Board of County Commissioners v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626, 639 (1997)(emphasis in original). An individual can be liable under § 1983 even where his or her employer is not named as a defendant, since the statutory language unambiguously authorizes a cause of action against "[e]very *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the

46

Case 3:05-cv-00350-KRG Document 26 Filed 08/23/07 Page 47 of 60

jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the

Constitution and laws . . ." 42 U.S.C. § 1983 (emphasis added). In *Kentucky v. Graham*, 473 U.S. 159,

105 S.Ct. 3099, 87 L.Ed.2d 114 (1985), the Supreme Court explained:

> A victory in a personal-capacity action is a victory against the individual defendant,
> rather than against the entity that employs him. Indeed, unless a distinct cause of action
> is asserted against the entity itself, the entity is not even a party to a personal-capacity
> lawsuit and has no opportunity to present a defense.

*Graham*, 473 U.S. at 167-168, 105 S.Ct. at 3106, 87 L.Ed.2d at 123. Hence, the Defendants' argument

that Adams, Myers and Ritchey cannot be held liable under § 1983 unless an action lies against the

District is wholly without merit.

The Defendants do not add much to their prior arguments with respect to Taylor's constitutional

claims. Instead, they merely state, in very general terms, that the Amended Complaint "still falls short"

of alleging conscience-shocking conduct, and that the allegations contained in the Amended Complaint

do not satisfy the elements applicable under Taylor's state-created danger theory. (Document No. 21,

p. 10, ¶¶ 29-30). Although the Defendants incorporate by reference their prior brief, that brief obviously

does not address the new allegations contained in the Amended Complaint. (*Id.*, p. 10, n. 2). Having

examined the Amended Complaint very closely, the Court is convinced that there are material

differences in the allegations contained therein from the allegations supporting Taylor's original

complaint, portions of which were dismissed by this Court in *Taylor I*.

The allegations against Adams in the Amended Complaint still do not allege a violation of the

Fourteenth Amendment. Most of the allegations against her involve omissions. (Document No. 20,

pp. 22-24). Adams was not at Wright when Devin began to feel tired. (*Id.*, p. 13, ¶ 45). Since she was

47

unaware of Devin's deteriorating condition, she could not have drawn an inference of a substantial risk of serious harm. *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979, 128 L.Ed.2d at 825 (explaining that in order for an official to exhibit subjective deliberate indifference, he "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference"). The same is true of Ritchey, who was unaware of Devin's condition until Myers discovered that he was no longer breathing, and that he was turning purple. (Document No. 20, pp. 13-14, ¶¶ 47-49). Consequently, Adams and Ritchey were not aware of Devin's deteriorating condition until it had already become a medical emergency. Taylor alleges no *affirmative acts* taken by either Adams or Ritchey subsequent to their discovery of Devin's condition which could indicate that they consciously disregarded a great risk of harm.[12] *Bennett v. City of Philadelphia*, ___F.3d ___, 2007 WL 2377601, at *5-7, 2007 U.S. App. LEXIS 19929, at *17-23 (3d Cir. August 22, 2007)(precedential opinion); *Taylor I*, 2006 U.S. Dist. LEXIS 70853, at *37-38. In this respect, the Amended Complaint does not change this Court's prior analysis in *Taylor I*.[13] *Taylor I*, 2006 U.S. Dist. LEXIS 70853, at *45

---

[12] The Court again acknowledges Taylor's allegations concerning the falsity of information given to emergency medical personnel, and to post-mortem investigators, concerning resuscitative efforts which either were or were not employed prior to the arrival of the emergency medical personnel. (Document No. 20, pp. 14, ¶¶ 51-52, 16, ¶¶ 57-59). Nevertheless, the Court again points out that since the emergency medical responders did not place any reliance on these allegedly false reports, these reports could not have contributed to Devin's death. *Taylor I*, 2006 U.S. Dist. LEXIS 70853, at *45, n. 17 ("Absent an allegation that the false report somehow *caused* Devin's death, by preventing the first responders from acting or otherwise, Taylor's false report averment cannot save her due process claims from the Defendants' Motion to Dismiss.").

[13] Despite the language contained in the Amended Complaint, Devin had no *constitutional* right to a "free appropriate public education." (Document No. 20-2, pp. 16, ¶ 185, 18, ¶ 195, 19, ¶ 205, 20-21, ¶ 215). This right was secured to Devin solely by the IDEA, since the District was apparently a recipient of federal funds. 20 U.S.C. § 1412(a)(1). Consequently, to the extent that Taylor relies on the Defendants' alleged failure to comply with the mandates of the IDEA, she alleges no violation of the Fourteenth Amendment. Moreover, it is clear that Taylor's allegations are based on a theory of substantive due process rather than on a theory of procedural due process. (Document No. 20-2, pp. 16-22, ¶¶ 183-221). Therefore, the Court has no occasion to consider whether Devin had a property interest in strict adherence to his IEP, and whether any failure on the part of the Defendants to comply with his IEP deprivedhim of such a property interest without

48

("Since Taylor fails to allege a single affirmative act which contributed to Devin's death, her complaint fails to state a claim upon which relief can be granted.").

The allegations against Myers, however, are somewhat different. In her original complaint, Taylor alleged that Myers had "failed to recognize and/or appreciate the significance and serious risks" associated with Devin's breathing difficulties when he informed her that he was not feeling well. (Document No. 1, pp. 10-11, ¶ 56). In *Taylor I*, the Court construed this allegation as an implicit acknowledgment that Myers had not drawn an inference that a substantial risk of serious harm to Devin's health existed. *Taylor I*, 2006 U.S. Dist. LEXIS 70853, at *37 ("This averment implicitly acknowledges that Myers drew no inference that a substantial risk of serious harm to Devin's health existed."). Moreover, in her original complaint, Taylor merely alleged that Myers had *suggested* that Devin "lay his head on the desk to rest." (Document No. 1, p. 8, ¶ 38). In the Amended Complaint, Taylor's allegations against Myers are materially different. Taylor now alleges that Myers *knew* that Devin would be vulnerable to a substantial risk of serious harm if his symptoms were not monitored in an appropriate manner. (Document No. 20, p. 25, ¶ 95). Taylor also alleges that Myers *refused* to allow Devin to contact Taylor or Adams, or to otherwise seek medical attention. (Document No. 20-2, p. 1, ¶ 98(e)). The Amended Complaint alleges that Devin was not *permitted* to care for his own needs. (Document No. 20, p. 12, ¶ 44)("The child was not permitted to go to the school nurse's office or to the principal's office; nor was the child permitted to contact his parent."). At this stage in the litigation, the Court must accept these allegations as true for the purpose of determining whether Taylor may be

due process of law. *Town of Castle Rock v. Gonzales*, 125 S.Ct. 2796, 2800-2810, 162 L.Ed.2d 658, 665-677 (2005).

entitled to relief under *any reasonable reading* of the Amended Complaint. *Pinker*, 292 F.3d at 374, n. 7. These allegations against Myers could be construed to allege that Myers *affirmatively prevented* Devin from seeking medical attention that he would have otherwise sought on his own. If true, this means that Myers affirmatively used her authority in a way that created a danger to Devin that would not have otherwise existed, or that made him more vulnerable to a danger than he would have been had she not acted at all. *Bright*, 443 F.3d at 281. Thus, the Amended Complaint satisfies the fourth "state-created danger" element with respect to the Fourteenth Amendment claim against Myers.

In order to proceed further, of course, Taylor must allege that Myers acted with a conscience-shocking level of culpability (i.e., that she was aware of facts from which an inference could be drawn that a substantial risk of serious harm existed, and that she actually drew such an inference) when she refused to let Devin seek medical attention. *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979, 128 L.Ed.2d at 825; *Taylor I*, 2006 U.S. LEXIS 70853, at *34. The Amended Complaint alleges that Myers was intimately involved in the development of Devin's IEP, Service Plan and ARP, and that Devin had constantly reminded her of his need for medication. (Document No. 20, p. 12, ¶ 43). Given these allegations, which are assumed to be true for purposes of the instant Motion to Dismiss, an inference could be made that Myers, in *refusing* to allow Devin to care for his own medical needs, consciously disregarded a substantial risk of serious harm to Devin's health. (Document No. 20-2, p. 1, ¶ 98(e))("Defendant Myers breached her responsibilities and duties . . . [i]n *refusing* to allow the child to contact the school nurse or his parent in order to receive direct and/or immediate attention for the symptoms and deteriorating condition[.]")(emphasis added). It can fairly be said that a teacher who affirmatively *refuses* to allow an asthmatic child to seek the appropriate medical attention under the

circumstances alleged by Taylor could be determined to act in a manner that is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847, 118 S.Ct. at 1717, 140 L.Ed.2d at 1058, n. 8. Thus, to the extent that Taylor alleges that Myers affirmatively prevented Devin from seeking medical attention by *refusing* to let him seek medical help, she alleges a violation of the Due Process Clause of the Fourteenth Amendment. *Kneipp*, 95 F.3d at 1209 ("The conduct of the police, in allowing Joseph to go home alone and in detaining Samantha, and then sending her home unescorted in a seriously intoxicated state in cold weather, made Samantha more vulnerable to harm. It is conceivable that, but for the intervention of the police, Joseph would have continued to escort his wife back to their apartment where she would have been safe.").

The Defendants' treatment of Taylor's Fourteenth Amendment claims in the instant Motion to Dismiss is somewhat problematic. In their first Motion to Dismiss, the Defendants expressly raised the defense of qualified immunity with respect to the personal capacity claims against Adams, Myers and Ritchey. (Document No. 8, pp. 3-4, ¶¶ 7-10). In *Taylor I*, the Court did not address the issue of qualified immunity for two reasons. First of all, since Taylor's Fourteenth Amendment claims were dismissed, the availability of qualified immunity as to those claims became moot. *Taylor I*, 2006 U.S. Dist. LEXIS 70853, at *61-62. Secondly, since the Defendants apparently sought the dismissal of the personal capacity counts against Adams, Myers and Ritchey under the IDEA, the Rehabilitation Act, and the ADA without articulating a legal basis for such a dismissal, the Court did not address those counts on the merits. *Taylor I*, 2006 U.S. LEXIS 70853, at *58-59 ("Since neither party advances arguments as to whether individuals can be sued under the IDEA, the Rehabilitation Act, and the ADA, the Court expresses no opinion as to whether Taylor can proceed against Ritchey, Myers and Adams

51

under those statutes."). In the instant Motion to Dismiss, the Defendants appear to be raising the defense of qualified immunity *only* with respect to Taylor's IDEA-based claims. (Document No. 21, p. 7, ¶ 20). The Defendants appear to move for the dismissal of Taylor's Fourteenth Amendment claims *solely* on the ground that she fails to state a claim upon which relief can be granted. (*Id.*, pp. 8-10, ¶¶ 25-32). It is not clear to the Court whether the Defendants are still asserting the defense of qualified immunity as to the personal capacity claims against Adams, Myers and Ritchey with respect to Taylor's Fourteenth Amendment claims.

This inquiry need not detain the Court for long, however, since it does not appear that Myers would be successful in such a defense, at this stage in the litigation, under the set of facts alleged by Taylor. The first part of the inquiry requires the Court to "examine whether the alleged constitutional or statutory violations were 'clearly established' at the time of the alleged violations." *Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir. 1999). If such a right was clearly established at the relevant point in time, the Court must proceed to determine whether a *reasonable person* would have known that his or her actions were in contravention of the law. *Id.* at 2008. This standard is objective, making the relevant official's subjective intent irrelevant. *Id.* It is clear that officials can be on notice that their conduct "violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 2516, 153 L.Ed.2d 666, 679 (2002). The question of whether a given action meets the conscience-shocking threshold has an elusive quality to it, making the application of qualified immunity in substantive due process cases problematic. *Estate of Smith v. Marasco*, 430 F.3d 140, 153 (3d Cir. 2005). The underlying constitutional violation itself requires a degree of egregiousness and arbitrariness that is difficult to reconcile with the inability of a *reasonable* official to understand that such conduct

52

is unlawful. In this circuit, the state-created danger theory is clearly established law. *Rivas*, 365 F.3d at 201 ("In sum, we find that the pre-existing law of 'state-created danger' jurisprudence was clearly established. As such, it was sufficient to put Garcia and Rodriguez on notice that their conduct, if deemed unlawful, would not shield them with immunity."). The Supreme Court has recognized that "general statements of law are not inherently incapable of giving fair and clear warning[.]" *United States v. Lanier*, 520 U.S. 259, 271, 117 S.Ct. 1219, 1227, 137 L.Ed.2d 432, 446 (1997). The act of refusing to let a child known to have asthma seek medical attention strikes the Court as an obvious act of conscience-shocking conduct. Consequently, to the extent that the Defendants are raising the defense of qualified immunity with respect to Myers, she is not entitled to it at this stage. The Court does note, however, that the allegations of Myers' *refusal* to let Devin contact Adams or Taylor were not included in the original complaint. (Document No. 1, p. 8, ¶ 38)("His teacher responded by suggesting to DJ that he lay his head on the desk to rest. The child did as he was instructed, whereupon Ms. Myers continued with scheduled activities for the remaining students."). The Amended Complaint alleges that such a refusal occurred, and this allegation is assumed to be true at this stage in the litigation. (Document No. 20-2, p. 1, ¶ 98(e))("In *refusing* to allow the child to contact the school nurse or his parent in order to receive direct and/or immediate attention for the symptoms and deteriorating condition")(emphasis added). If the evidence does not support this new allegation, Myers remains free to raise the defense of qualified immunity at a later stage. *Behrens v. Pelletier*, 516 U.S. 299, 309, 116 S.Ct. 834, 840, 133 L.Ed.2d 773, 785-786 (1996). The Court will not dismiss the Fourteenth Amendment claim against Myers at this time, especially since the Defendants have not articulated a clear argument for qualified immunity with respect to Taylor's Fourteenth Amendment claims. (Document No. 21, pp. 8-10, ¶¶ 25-

32).

Count XVIII alleges that the Defendants violated Taylor's constitutional rights by depriving her of Devin's consortium, love and support. (Document No. 20-2, p. 22, ¶¶ 222-224). In this circuit, a parent has a cognizable liberty interest in the life and physical safety of a minor child. *Estate of Bailey v. County of York*, 768 F.2d 503, 509, n. 7 (3d Cir. 1985), overruled on other grounds by *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). At the time of his death, Devin had not yet reached adulthood. Therefore, Taylor's liberty interest in his health and safety remained within the ambit of constitutional protection. *McCurdy v. Dodd*, 352 F.3d 820, 825-831 (3d Cir. 2003). Accordingly, the Court will deny the Defendants' Motion to Dismiss Count XVIII to the extent that Count XVIII is based on the allegation that Myers affirmatively prevented Devin from seeking medical attention (i.e., that Myers *refused* to let Devin contact Taylor or otherwise seek help for his deteriorating condition). Count XVIII must be dismissed, however, to the extent that it is based on the alleged omissions of Adams and Ritchey, whose alleged conduct does not reach the conscience-shocking threshold. The Defendants also move for the dismissal of Count XXI of the Amended Complaint, which seeks an award of punitive damages from Adams, Myers and Ritchey. (Document No. 21, pp. 10-11, ¶¶ 33-35). They contend that Count XXI is moot because of the alleged inability of Taylor to allege a cognizable constitutional violation. (*Id.*, ¶ 33). As noted earlier, however, the Court construes the Amended Complaint to allege a cognizable claim under § 1983 against Myers. Consequently, Count XXI will be dismissed only with respect to the claims for punitive damages against Adams and Ritchey.

It remains to be determined whether the Fourteenth Amendment claim against the District,

which is contained in Count XVII of the Amended Complaint, should be dismissed. There are two averments in the Amended Complaint which distinguish Taylor's Fourteenth Amendment claims against the District from her Fourteenth Amendment claims against Adams, Myers and Ritchey. First of all, Taylor seeks to proceed against the District pursuant to a "failure to train theory." (Document No. 20-2, p. 21, ¶ 216). Secondly, Taylor specifically avers that the District had a policy prohibiting students from carrying prescription medications, or from taking such medications, while on school grounds. (*Id.*, ¶ 217). These averments are sufficient to enable Count XVII to survive the instant Motion to Dismiss.

In *Taylor I*, the Court explained that Taylor's "failure to train" theory was inapplicable to this case because she did not properly allege a Fourteenth Amendment violation. *Taylor I*, 2006 U.S. Dist. LEXIS 70853, at *47-49 (explaining that Taylor could not proceed under a "failure to train" theory because no Fourteenth Amendment violation was properly alleged). In order to succeed in a "failure to train" claim under § 1983, a plaintiff must "identify a failure to provide specific training" which has a causal nexus with his or her injuries, and must "demonstrate that the absence of that specific training can reasonably be said to reflect a deliberate indifference to whether the alleged *constitutional deprivations* occurred." *Reitz v. County of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997)(emphasis added). Thus, Taylor cannot prevail in such a claim merely by showing that the District's failure to train exhibited deliberate indifference to Devin's medical needs. Instead, she must show that the District was deliberately indifferent to Devin's constitutional rights (i.e., the right to not be affirmatively prevented from seeking medical attention on his own). Since Devin's mere presence in the school environment did not constitute custodial detention, the District had no *constitutional* duty to train its employees to

adequately provide for his medical care.[14] *Black*, 985 F.2d at 713-714, *D.R.*, 972 F.2d at 1372. Since

the Amended Complaint alleges that Myers violated Devin's Fourteenth Amendment rights, and that

the District's failure to train her (for the purpose of preventing the alleged violation) exhibited deliberate

indifference as to whether Myers' conduct would be in adherence with the constitutional mandate, there

is no basis for dismissing Count XVII of the Amended Complaint.

As noted earlier, Taylor cannot prevail in her § 1983 action against the District without

demonstrating that the District, through its *deliberate* conduct, was the *moving force* behind the alleged

constitutional violation. *Brown*, 520 U.S. at 404, 117 S.Ct. at 1388, 137 L.Ed.2d at 639. To satisfy this

hurdle, Taylor alleges that the District had a policy which prevented Devin from carrying his own

medication, or from administering the medication on his own.[15] (Document No. 20-2, p. 21, ¶ 217).

The Court expresses no opinion as to whether this policy placed upon the District, or upon Myers, an

affirmative duty to ensure that Devin received his medication as prescribed. In their Motion to Dismiss,

---

[14] The Court makes this observation only with respect to the "failure to train" theory pursued by Taylor, which is relevant to Myers' alleged conduct in refusing to allow Devin to contact Taylor or Adams when his condition worsened. At this stage, the Court expresses no opinion as to whether the District's alleged policy prohibiting students from administering their own medication imposed an affirmative duty on the District to ensure that its disabled students were properly medicated.

[15] Taylor apparently believes that Adams can be held personally liable under a "failure to train" theory. (Document No. 24, p. 32, ¶ 2). The problem with Taylor's argument is that it takes the "failure to train" theory out of its proper context. First of all, the allegations cannot be fairly read to assert that Adams was Myers' supervisor. Secondly, the Due Process Clause of the Fourteenth Amendment does not require a school nurse to train school employees to deal with medical emergencies. A viable failure to train claim under § 1983 must rest on an allegation that a municipality or supervisor did not provide the training needed to prevent *constitutional violations*, not to prevent medical calamities. *Taylor I*, 2006 U.S. Dist. LEXIS 70853, at *47 ("The language in *Reitz* regarding the 'failure to train' theory speaks to a municipality's duty to train its employees for the purpose of preventing *constitutional violations*. It does not speak to the question of whether the District had a duty to train its employees for the purpose of *preventing Devin's death*.")(emphasis in original). It may be that Adams was negligent in not instructing Myers as to how Devin should be medicated. That doesnot mean that she violated Devin's rights under the Fourteenth Amendment, or that she can be held personally liable under § 1983 for failing to train Myers as to Devin's rights under the Fourteenth Amendment. *Daniels v. Williams*, 474 U.S. 327, 332, 106 S.Ct. 662, 665, 88 L.Ed.2d 662, 668 (1986)("To hold that injury caused by such conduct is a deprivation within the meaning of the Fourteenth Amendment would trivialize the centuries-old principle of due process of law.").

56

the Defendants do not address the new averments contained in the Amended Complaint, opting to rely almost exclusively on the Court's prior determination in *Taylor I*. (Document No. 21, pp. 8-10, ¶¶ 25-32). Nonetheless, the Court is convinced that the new allegations contained in the Amended Complaint make a dispositive difference, and that the Fourteenth Amendment claims against Myers and the District cannot be dismissed at this stage. The Court will be in better position to evaluate the applicability of the District's policy, and the effect that it may have had on the District's duties with respect to Devin, when the record is more fully developed.

## E. The Claims Arising Under Pennsylvania Law

In Counts XIX and XX of the Amended Complaint, Taylor seeks damages for Devin's death under Pennsylvania law pursuant to 42 Pa.C.S. §§ 8301 and 8302. (Document No. 20-2, pp. 22-23, ¶¶ 225-226). In *Taylor I*, the Court concluded that these claims were barred by Pennsylvania's Political Subdivision Tort Claims Act [42 Pa.C.S. § 8541 *et seq.*]. *Taylor I*, 2006 U.S. Dist. LEXIS 70853, at *51-52. Taylor does not dispute that her claims under Pennsylvania law are barred by the Political Subdivision Tort Claims Act. (Document No. 24, p. 31, ¶ G(1)). Therefore, the Court will dismiss Counts XIX and XX of the Amended Complaint.

## CONCLUSION

Since there is no individual liability under the IDEA, Section 504 of the Rehabilitation Act, or Title II of the ADA, the Court will dismiss Counts I, II, III, V, VI, VII, IX, X, and XI of the Amended Complaint. Given that violations of these statutes are not actionable under § 1983, the Court will dismiss Count XIII of the Amended Complaint. Adams and Ritchey were unaware of Devin's deteriorating condition when he stopped breathing at Wright, so they could not have drawn an inference

57

that a substantial risk of serious harm to his health existed. *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979, 128 L.Ed.2d at 825. Therefore, their conduct could not have exhibited the type of subjective deliberate indifference necessary to satisfy the conscience-shocking threshold, and the Court will dismiss Counts XIV and XVI of the Amended Complaint. Myers is alleged to have observed Devin when his condition was deteriorating, and to have affirmatively refused to let him contact his mother or otherwise seek medical attention. Such alleged conduct, when viewed within the context of Myers' alleged knowledge of Devin's asthma, can "fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 848, 118 S.Ct. at 1717, 140 L.Ed.2d at 1058-1059. Such conduct may also be said to constitute an *affirmative act* which made Devin more vulnerable to the harm caused by his underlying medical condition. *Bennett*, 2007 WL 2377601, at \*7, 2007 U.S. App. LEXIS 19929, at \*20-21 (precedential opinion); *Bright*, 443 F.3d at 281. Therefore, the Court will not dismiss Count XV. Taylor alleges facts sufficient to establish that the District's policy of prohibiting students from administering their own medications, coupled with the District's failure to train Myers as to Devin's constitutional rights, served as the *moving force* behind the alleged constitutional violation committed by Myers. Hence, the Court will not dismiss Count XVII. Count XVIII will be dismissed only insofar as it is asserted against Adams and Ritchey. It will not be dismissed insofar as it is asserted against Myers and the District. Counts XIX and XX will be dismissed, since the parties agree as to this disposition. Count XXI will be dismissed with respect to Adams and Ritchey, but not with respect to Myers.

In concluding that most of Taylor's allegations do not constitute conscience-shocking conduct, the Court does not mean to trivialize the tragic death of this young child. The Court is mindful of the tragic consequences allegedly resulting from a long pattern of inexplicable negligence. It is important

58

to remember, however, that "it is a constitution we are expounding." *McCulloch v. Maryland*, 17 U.S. 316, 407, 4 L.Ed. 579, 602 (1819). "Our Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." *Daniels*, 474 U.S. at 332, 106 S.Ct. at 665, 88 L.Ed.2d at 669. Only the specific allegations concerning Myers' refusal to permit Devin to contact his mother, or to otherwise seek medical help, implicate "the large concerns of the governors and the governed[.]" *Id.* The people of Pennsylvania may create a system "which would place upon the State and its officials the responsibility for failure to act in situations such as the present one" by changing the tort law of Pennsylvania in accordance with the legislative process, "[b]ut they should not have it thrust upon them by this Court's expansion of the Due Process Clause of the Fourteenth Amendment." *DeShaney*, 489 U.S. at 203, 109 S.Ct. at 1007, 103 L.Ed.2d at 264. An appropriate order follows.

59

**AND NOW**, this 23rd day of August, 2007, this matter coming before the Court on the Defendants' Motion to Dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)* (Document No. 21), **IT IS HEREBY ORDERED** that the Defendants' Motion to Dismiss is **GRANTED** with respect to Counts I, II, III, V, VI, VII, IX, X, XI, XIII, XIV, XVI, XIX and XX of the Amended Complaint, **DENIED** with respect to Counts XV and XVII of the Amended Complaint, and **GRANTED IN PART AND DENIED IN PART** with respect to Counts XVIII and XXI of the Amended Complaint. More specifically, Count XVIII is dismissed only to the extent that it is based on the alleged omissions of Defendants Adams and Ritchey, which do not shock the conscience. In all other respects, Defendants' Motion to Dismiss Count XVIII is denied. Count XXI is dismissed only with respect to Plaintiffs' claims for punitive damages against Defendants Adams and Ritchey. In all other respects, Defendants' Motion to Dismiss Count XXI is denied.

BY THE COURT:

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

cc:    David P. Andrews, Esq.
       Roberta Binder Heath, Esq.
       Anthony J. Zanoni, Esq.
       Alan R. Krier, Esq.

60