IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SONYA TAYLOR, *Administratrix of the Estate of Devin J. Taylor, and in her Own Right,* | ) ) ) ) | |
| Plaintiff, | ) ) | CIVIL NO. 3:2005-350 |
| v. | ) ) | JUDGE KIM R. GIBSON |
| ALTOONA AREA SCHOOL DISTRICT, and CAROL MYERS, | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

This matter arises from the most tragic of circumstances. Having previously adjudicated two motions to dismiss in this matter, the Court now examines the claims of Sonya Taylor ("Taylor") in the summary judgment context with a thoroughly developed evidentiary record that provides the Court details into Devin's educational experience and the asthma attack that ultimately took Devin's life. Defendants filed their Motion for Summary Judgment ("Defs.' Mot.") (Doc. No. 78) with regard to Plaintiff's remaining claims along with a brief ("Defs.' Br."). Plaintiff has filed a responsive brief ("Pl.'s Br.") (Doc. No. 80). Both sides have filed respective Concise Statements of Material Facts ("CSMF") and responded to one another's Concise Statements of Material Facts ("RCSMF"). Defendants have also filed a Reply Brief ("Reply") (Doc. No. 88).

### I. JURISDICTION

The Court has subject matter jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1343. Plaintiff's claims arise under 20 U.S.C. § 1400, *et seq.*, 29 U.S.C. § 794, 42 U.S.C. §

12101 *et seq.*, and 42 U.S.C. § 1983. Venue is proper because Plaintiff and the Defendant School District are located in Blair County, in the Western District of Pennsylvania.

## II. **PROCEDURAL BACKGROUND**

This Court previously dismissed Defendants Suzanne Ritchey ("Ritchey") and Michelle Adams, R.N., ("Adams") from this matter.[1] Plaintiff's Amended Complaint (Doc. No. 20) ("Compl.") implicitly concedes the Altoona Area School Board's dismissal from this litigation. In the Amended Complaint, even though the Board does appear in the caption, Plaintiff omits the Board when she states that "[t]hese claims are made against the Altoona Area School District, the Principal of Wright Elementary School, the school nurse and the child's third grade teacher."

## III. **FACTUAL BACKGROUND**

The following facts drawn from Defendants' Concise Statement of Material Facts ("DCSMF") are undisputed unless otherwise noted. On September 24, 2003, Devin "D.J." Taylor ("Devin") was one of 17 students in Carol Myers' third grade class at Wright Elementary School. (DCSMF ¶¶ 4-5, 95.) He suffered a massive asthma attack that afternoon. Devin had a diagnosis of asthma, and in the three years preceding his death he was treated either in the emergency room or hospital a total of twelve times. (DCSMF ¶¶ 11, 14.) During the last year of his life, not including September 24, 2003, he went to either the emergency room or hospital seven times. (DCSMF ¶ 15.) These hospital visits were almost all related to Devin's asthma. (DCSMF ¶ 16.) On January 18, 2003, Devin was actually life-flighted to Pittsburgh and hospitalized for one week following an asthma attack he suffered at a friend's house. (DCSMF

---

[1] *See* Memorandum Opinion and Order dated August 23, 2007 (Doc. No. 26), also found at *Taylor v. Altoona Area School Dist.*, 513 F.Supp.2d 540 (W.D. Pa. 2007) ("*Taylor II*"). Taylor's IDEA, Rehab Act, and ADA claims brought against Adams, Myers, and Ritchey were previously dismissed because individual liability is not available under either of these statutes. The remaining IDEA, Rehab Act, and ADA claims are against the School District. *See Taylor II*, 513 F.Supp. 2d at 556-58.

2

¶¶ 17-19.) Adams, Wright Elementary's school nurse, learned of the January 18, 2003, asthma attack and discussed it with Carol Myers ("Myers").

Devin had a Service Plan and an Asthmatic Reaction Procedure in place. (DCSMF ¶ 67.) The Service Plan executed on August 27, 2003, provided as follows:

> Student to use before exercise [inhaler]
> Allow student to use inhaler as prescribed by physician
> Notify parents if asthma symptoms persist after using inhaler as directed
> Proventil inhaler two (2) puffs every four (4) hours, as needed for shortness of breath or difficulty breathing.
> Notify 911 if child is showing signs of respiratory distress.

(DCSMF ¶ 67; Defs.' Ex. Y.) The Asthmatic Reaction Procedure provided instructions on what to do in the event of an asthma attack, including to call 911 and begin CPR if the child stops breathing or loses consciousness. (Defs.' Ex. Y.) Ritchey, the building principal, kept copies of all the Service Plans for students in her building. (DCSMF ¶ 60.) Adams kept in her file a questionnaire filled out by Taylor regarding Devin's asthmatic condition. (DCSMF ¶ 70.) In addition, Myers had both a copy of Devin's Service Plan and an inhaler for him. (DCSMF ¶¶ 73-74, 102-103.) Adams, Ritchey, and Myers met before the start of the 2003-2004 school year to discuss Devin's asthma. (DCSMF ¶ 97.) Adams told Myers what symptoms to watch for and explained to her that Devin was to use his inhaler before Physical Education class and in any situation where he was exercising strenuously. (DCSMF ¶ 98[2].) Devin knew when he was experiencing asthmatic symptoms and would use his inhaler. (DCSMF ¶ 82.) Devin sat right in front of Myers so that she could monitor him. (DCSMF ¶ 104.)

While Devin did have a Service Plan, he did not have an Individualized Education Plan (IEP). (DCSMF ¶ 83.)

---

[2] Two of Defendants' statements of fact are numbered 98. This reference to DCSMF ¶ 98 refers to both of them.

As school nurse, Adams would split her time between Wright Elementary and Washington and Jefferson Elementary. (DCSMF ¶ 91.) At the time of Devin's asthma attack on September 24, 2003, Adams was at Washington and Jefferson Elementary. (DCSMF ¶ 108.) She received a call at 2:30 p.m. about Devin's asthma attack and promptly returned to Wright Elementary. (DCSMF ¶ 108.)

On the morning of September 24, 2003, Devin looked congested to Myers. (DCSMF ¶ 105.) That afternoon, after recess, the students returned to the classroom between 1:20 p.m. and 1:30 p.m. (DCSMF ¶ 113.) From this point on very few facts are undisputed. According to Defendants, Myers asked Devin if he wanted to go to the nurse, and Devin said he did. (DCSMF ¶ 115.) According to Plaintiff, Devin asked Myers if he could go to the nurse, and Myers said "No, Devin, not now." (RDCSMF ¶ 115.) Defendants claim Devin was sitting upright at a desk and struggling to breathe. (DCSMF ¶ 119.) Plaintiff claims Devin had his head on his desk. (RDCSMF ¶ 119.) Ritchey was notified and came to the classroom, though it is disputed how she was contacted. (DCSMF ¶ 117; RDCSMF ¶ 117.) Defendants say Myers called her secretary who called Ritchey, while Taylor says Myers sent Devin's classmate, a student identified in the record as "T.T.," to Ritchey's office to notify her about the emergency. (DCSMF ¶ 117; RDCSMF ¶ 117.)

Ritchey instructed Monica DiStefano, the nurse's assistant, to call both Taylor and Adams. (DCSMF ¶ 120.) Ritchey also tried to call 911 from the classroom, but the call did not go through, so Ritchey directed Myers to run to the office and call 911. (DCSMF ¶ 120.)

A fireman arrived within minutes, placed Devin on the floor, and began resuscitative efforts. (DCSMF ¶ 124.) The first AMED was dispatched at 2:35 p.m., arrived on site at 2:37 p.m., and was at "bed-side" at 2:39 p.m. (DCSMF ¶ 127.) John Seymour, with the first AMED

4

crew, attempted unsuccessfully to intubate Devin. (DCSMF ¶ 128.) The second AMED crew arrived at 2:40 p.m. and ultimately succeeded at intubation. (DCSMF ¶ 129-130.) Devin was taken to Altoona Hospital and then life-flighted to Pittsburgh. (DCSMF ¶ 132.) Devin died on September 27, 2003, just short of his ninth birthday. (DCSMF ¶¶ 2, 3.)

## IV. STANDARD OF REVIEW

Summary judgment is appropriate where "it is demonstrated that there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Troy Chem. Corp. v. Teamsters Union Local No. 408*, 37 F.3d 123, 125-126 (3d Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-32 (1986)). Materiality is defined by the substantive law, and a dispute over a material fact is a dispute "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "An issue of material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Troy Chem. Corp.*, 37 F.3d at 126 (quoting *Anderson*, 477 U.S. at 248)). The Court draws all reasonable inferences in favor of the nonmoving party, in this case, Sonya Taylor. *Troy Chem. Corp.*, 37 F.3d at 126.

## V. DISCUSSION

### A. IDEA CLAIM

Sonya Taylor ("Taylor") has brought a claim against the District under the Individuals with Disabilities Education Act (IDEA), one of the main purposes of which is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C. § 1400(d)(1)(A). An Individualized Educational Program (IEP) is "the primary vehicle for providing students with the

required free and appropriate education." *S.H. v. State-Operated School Dist. Of Newark*, 336 F.3d 260, 264 (3d Cir. 2003).

The Court first addresses a threshold jurisdictional issue that it raised *sua sponte* in adjudicating the last motion to dismiss and on which it requested further briefing from the parties. The question of this Court's subject matter jurisdiction arose because the "unclear state of the record" suggested that Taylor had not resorted to the IDEA's administrative process. *See Taylor II*, 513 F.Supp.2d at 552 n.3 (noting the difficulty in ascertaining whether this Court has subject matter jurisdiction given the "unclear state of the record, as well as the failure of the parties to address the question of whether Taylor's IDEA claims are even cognizable under these circumstances," and instructing the parties to provide argument on the jurisdictional issue in future filings). In their Answer, Defendants did raise as an affirmative defense Taylor's failure to exhaust her administrative remedies but did so in very general terms without reference to the IDEA. (Doc. No. 27 ¶ 232.) The Court directed the parties to brief the issue of whether administrative remedies had been exhausted only as to Taylor's IDEA claim. Pennsylvania's implementing regulations explicitly exempt § 504 discrimination claims from any exhaustion requirement. 22 Pa. Code § 15.10 ("A student filing a claim of discrimination need not exhaust the procedures in this chapter prior to initiating a court action under Section 504.").

### 1. Exhaustion of Administrative Remedies

The IDEA requires that a party, before filing a civil action, exhaust the procedures available under §§ 1415(f) (impartial due process hearing) and (g) (appeal of administrative hearing decision). 20 U.S.C. § 1415(l).[3] The exhaustion requirement serves the important purpose of allowing "'state and local education agencies[,] in cooperation with the parents or guardian of the child,' to take 'primary responsibility for formulating the education to be

---

[3] 20 U.S.C. § 1415(l) was formerly § 1415(f).

6

accorded a handicapped child.'" *Jeremy H. by Hunter v. Mount Lebanon School Dist.*, 95 F.3d 272, 284 (3d Cir. 1993) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982)). Failure to exhaust would deprive this Court of subject matter jurisdiction, absent some exception to the exhaustion requirement. *Komninos by Komninos v. Upper Saddle River Bd. of Educ.*, 13 F.3d 775,778 (identifying § 1415(i)(2)[4] as a grant of subject matter jurisdiction to district courts and noting that "it is clear from the language of the Act that Congress intended plaintiffs to complete the administrative process before resorting to federal court.") The fact that Devin is not currently receiving services under the IDEA does not in itself exempt Taylor from the exhaustion requirement. *Ruecker v. Sommer*, 567 F.Supp.2d 1276, 1285 (D. Or. 2008).

It appears that not even the procedures of § 1415(f) were exhausted, let alone the appeal procedures in § 1415(g). Taylor implicitly concedes that she did not avail herself of the IDEA's administrative procedures by not even addressing that issue and solely arguing that she was excused from the exhaustion requirement. (*See* Pls.' Br. 3.) Discovery in this matter has revealed no record of any due process hearing pursuant to § 1415(f). Defendants assert that there exists "no evidence that Plaintiffs made a request under the IDEA with respect to Plaintiff-Decedent, nor is there any evidence that Defendant-School District denied a request for Plaintiff-Decedent under the IDEA." (Defs.' Br. 9.) This is not surprising since at the motion to dismiss stage there was ample confusion (shared by the School District) as to whether or not Devin even had an IEP. (*See* Defs.' Br. 7 ("[T]he testimony and evidence adduced during discovery reveal that Plaintiff-Decedent did not have an IEP.").)[5] It seems unlikely that Sonya Taylor was navigating the IDEA's administrative mechanisms if she was so mistaken about the IDEA that

---

[4] 20 U.S.C. § 1415(i)(2) was formerly § 1415(e)(2).
[5] This confusion has been present since this lawsuit's inception. The Amended Complaint alleges that "the Defendants and Taylor participated in the development of an Individualized Education Program (IEP) addressing issues pertinent to the child's disabilities." (Compl. ¶ 29.)

7

she thought her son had an IEP when he did not. The Court therefore finds that Plaintiff has failed to exhaust her administrative procedures and looks to whether exhaustion may be excused, a question the Court also asked the parties to address. *See Taylor II*, 513 F.Supp.2d at 552 n.3.

## 2. Excusal of Exhaustion on Grounds of Futility

The School District's position is that Taylor should have pursued the remedies provided by 20 U.S.C. § 1415 as to Devin's educational needs from January 2003 up until his death. The School District concedes that exhaustion is not required for the events of September 24, 2003. (Defs.' Br. 8.) Plaintiff argues that the exhaustion requirement is excused on grounds of futility because Devin has died.

Where the relief a plaintiff seeks is not available in administrative proceedings, exhaustion is not required. *Hicks et al. v. Purchase Line School Dist.*, 251 F.Supp. 2d 1250, 1252 (W.D. Pa. 2003). There are several recognized scenarios where the exhaustion requirement may be excused for futility. *See, e.g., Lester H. by Octavia P. v. Gilhool*, 916 F.2d 865, 870 (3d Cir. 1990) (where relief of compensatory education was unobtainable through the administrative process); *W.B. v. Matula*, 67 F.3d 484, 496 (3d Cir. 1995) (finding the relief sought was unavailable and questioning the competence of the administrative tribunal to adjudicate plaintiff's claims in light of the settlement agreement in place). The concept of a futility exception was alive at the legislative inception of the IDEA's exhaustion provision, and it was recognized that "[e]xhaustion of EHA administrative remedies would . . . be excused where . . . resort to those proceedings would be futile." *Matula*, 67 F.3d at 496 (citing 1986 U.S.C.C.A.N. at 1805) (*abrogated in part on other grounds by A.W. v. Jersey City Public Schools*, 486 F.3d 791 (3d Cir. 2007)).

As it happens, the futility argument advanced by Plaintiffs has already been envisioned by this circuit. The Third Circuit in *Matula* imagined "other very narrow exceptions permitting the exhaustion requirement to be waived . . . *such as where the parents of a deceased child seek damages for a school board's failure to provide IDEA services while the child was still alive.*" 67 F.3d at 496 (emphasis added). This case presents the exact "narrow exception" where the *Matula* court predicted that exhaustion would be patently futile. Indeed, the court in *Susavage v. Bucks Cy. Schools Intermediate Unit No. 22, et al.*, Civil No. 00-6217, 2002 WL 109615 (E.D. Pa. Jan. 22, 2002), faced with the situation where parents of a deceased child brought an IDEA claim, applied *Matula*'s reasoning. In *Susavage*, the decedent suffered from a seizure disorder and musculo-skeletal problems that prevented her from sitting upright independently. *Susavage*, 2002 WL 109615, at *1. She was strangled by her special harness while riding the school bus and subsequently died. *Susavage*, 2002 WL 109615, *at *1-2*. The court, citing the above passage from the *Matula* opinion, found that "[t]his case involves precisely the type of narrow exception contemplated by the third circuit in *Matula*. The monetary relief sought by plaintiffs cannot be obtained through IDEA administrative proceedings. As such be futile, the exhaustion requirement is waived." *Susavage*, 2002 WL 109615, at *19.

The Court sees no reason why *Matula*'s narrow exception should not apply here. Devin has died, and Taylor cannot obtain her desired relief through the administrative process. Taylor is therefore excused from the exhaustion requirement on grounds of futility.

The fact that Taylor did not request that Devin be afforded the protections of the IDEA between January 2003 and September 2003 does not affect the Court's determination. Even construing January 18, 2003, as the date on which Taylor "knew or should have known" that Devin had not been "found" by the School District pursuant to the "child find" duty, she still had

9

until January 18, 2005, to request an impartial hearing. 20 U.S.C. § 1415(f)(3)(C) (imposing a statute of limitations of two years to raise an IDEA claim). Devin died approximately eight months after the earliest date Taylor's IDEA claim is alleged to have accrued. Once Devin died, it was futile for Taylor to seek relief through the IDEA's administrative process.

Excusing exhaustion in this instance does not widen the futility exception. In describing the deceased child scenario, the *Matula* court noted that an exception such as this, "whether based on futility or other grounds, would be rare indeed." 67 F.3d at 496. The Court also views excusing exhaustion on grounds of futility in this instance as commensurate with the purposes of the IDEA's exhaustion requirement. The IDEA provides for a "free appropriate public education" and includes elaborate procedures for redressing harm under the IDEA. Congress' purpose in including a remedial scheme in the statute was to allow educational experts the opportunity to address complaints first. The IDEA "does not envision courts as the factfinders in the first instance." *Lindsley ex rel. Kolodziejczack v. Girard School*, 213 F.Supp. 2d 523, 535 (W.D. Pa. 2002). Since Devin has died, the Court would not be usurping from the School District any opportunity to address Devin's educational needs by excusing exhaustion in this case.

### 3. IDEA Claim not Established

This case presents an unusual IDEA claim because discovery has revealed that Devin never had an Individualized Education Program (IEP), yet for much of this litigation all parties thought that he did.[6] Taylor's IDEA claim now is that Devin should have had an IEP, that he should have been "found" pursuant to the IDEA's "child find" duty. The IDEA's "child find" provision imposes the following requirement:

---

[6] In their answers to both the original Complaint and the Amended Complaint, Defendants admit that they developed an IEP with Taylor. (Doc. No. 18 ¶ 23; Doc. No. 27 ¶ 29.)

> All children with disabilities residing in the State, including
> children with disabilities who are homeless children or are wards
> of the State and children with disabilities attending private schools,
> regardless of the severity of their disabilities, and who are in need
> of special education and related services, are identified, located,
> and evaluated and a practical method is developed and
> implemented to determine which children with disabilities are
> currently receiving needed special education and related services.

20 U.S.C. § 1412(a)(3). The regulations implementing the IDEA make clear that to be protected

by the IDEA, a child must not only have a disability in the general sense but also have academic

problems resulting from that disability. According to the regulations, a "[c]hild with a disability

means a child evaluated . . . as having . . . an other health impairment . . . *and who, by reason*

*thereof, needs special education and related services.*" 34 C.F.R. § 300.8(a)(1) (emphasis

added). Devin was never evaluated to see if he needed an IEP, but his mother is now arguing he

should have been. The question is therefore whether there exist any genuine issues of material

fact that the School District violated the "child find" duty of the IDEA.

Defendants would have this Court allocate burdens as the Supreme Court did in *Schaffer*

*ex rel. Schaffer v. Weast*, 546 U.S. 49, 56-58 (2005). In *Schaffer*, the Court assigned the burden

of persuasion in IDEA claims "where it usually lies, upon the party seeking relief." 546 U.S. at

58. *Schaffer*, however, dealt with the burden of persuasion during administrative proceedings.

There are no administrative proceedings to speak of in this case, and in addition this is a motion

for summary judgment. The movant bears the burden of showing that no genuine issue of

material fact exists, and all inferences are drawn in favor of the non-moving party. Drawing all

reasonable inferences in Taylor's favor, the Court looks to see whether a genuine issue of

material fact exists as to whether Devin should have been identified and brought within the

procedures of the IDEA.

11

Defendants assert that Taylor fails to establish an IDEA claim because Devin did not raise any concerns that would prompt the school to conduct an evaluation for an IEP. The "child find" provision of the IDEA applies to children who are *both* disabled *and* "in need of special education and related services." 20 U.S.C. § 1412(a)(3). While Devin had a qualifying disability[7], Defendants argue that "there was no evidence that [Devin] needed specially designed instruction to receive a [sic] appropriate education because of his asthmatic condition. To the contrary, all of the evidence revealed that Plaintiff-Decedent was a good student, with average grades, and social with the other students." (Defs.' Br. 7.) Defendants further point out that Devin "did not have an attendance problem nor did he exhibit behavioral issues that would warrant an evaluation." (Defs.' Br. 7.) Taylor responds to Defendants by disputing how good Devin's grades were. (RDCSMF ¶ 84.) She also points out that Devin's second grade teacher, Regina Keisewetter, remembered Devin as "disruptive." (Keisewetter Dep. 39-40.)

With respect to the School District's dissemination of information to the community, Taylor does not allege that the District failed to meet its notice requirements.[8] An IDEA claim can still be asserted, however, even if a school has provided adequate notice since a school also has a "continuing obligation under the IDEA . . . to identify and evaluate all students who are reasonably suspected of having a disability under the statut[e]." *P.P. ex rel. Michael P. V. West Chester Area School Dist.*, 585 F.3d 727 (3d Cir. 2009). Even if parents do not contact the school in response to notices, it is still the responsibility of the school to identify those children who are in need of the IDEA's protections. *See* 20 U.S.C. § 1412(a)(3).

---

[7] Devin had asthma. Asthma is specifically listed in 34 C.F.R. § 300.8(c)(9) as a disorder that can satisfy the first part of the "other health impairment" definition, the second requirement being that the disorder "[a]dversely affect[] a child's educational performance."

[8] The Altoona Area School District 2001-2002 Parent Handbook provides parents with information on special education and invites them to contact the Special Education Department for a copy of the Procedural Safeguards Notice. (Defs.' Ex. T.) The District also publishes an annual notice in the *Altoona Mirror* informing parents about special education services. (Defs.' Ex. AA.)

The School District followed a number of procedures to identify children in need of special education in accordance with the "child find" duty of the IDEA. George Kattouf, the director of special education with the Altoona Area School District, was responsible for "ensur[ing] that all children within the district receive a free and appropriate education in the least restrictive environment." (Kattouf Dep. 12:12-15.) He was also responsible for implementing the child find duty by locating children eligible for special education. (Kattouf Dep. 12:16-20.)

Kattouf described the process of referring a child to a child study team as "informal." (Kattouf Dep. 18: 7-9.) Kattouf regards the child study team as a "screening process, the goal being to try to help the child stay in a regular education environment." (Kattouf Dep. 18:4-7.) A child may come to the child study team's attention in a variety of ways. A teacher who suspects a child is eligible for special education would normally contact the building principal. (Kattouf Dep. 18:24 - 19:3.) A child identified as a potential candidate for special education would be discussed at a child study team meeting. (Kattouf Dep. 18:9-13.) The parent might participate in the meeting if the child study team felt it was appropriate. (Kattouf Dep. 18:10-18.) If the child study team finds the child may be eligible for special education, the team refers the child to the special education department for a thorough evaluation. If the child ultimately receives an IEP as a result of the evaluation, the child would be monitored by an IEP team.

A child already on a service plan, as Devin was, might be identified as possibly in need of an IEP. An IEP may be triggered for a child on a service plan "[i]f a child service plan was not providing the reasonable accommodations to allow he [sic] or she [sic] to make meaningful progress in a regular ed[ucation] environment." (Kattouf Dep. 32:18-24.)

Myers would be consulted in the preparation of an IEP for one of her students and would provide input on an IEP. (Myers Dep. 11:14 - 12:8.) Myers would talk with parents about what needed to be done to maintain a child's grade level performance. (Myers Dep. 12:9-18.) She described her input into the development of a child's IEP as purely educational, as she would provide insight into the child's academic performance. (Myers Dep. 12: 16-25.) Myers knew that Devin had severe asthma. (Myers Dep. 14:9-25.) However, she did not find he was struggling academically and described his academic performance as "average." (Myers Dep. 85:4.)

The parties' expert reports affirm that the District's "child find" duty was not triggered. Taylor's expert Shirley Woika determined that Devin's asthma fit the disability requirement of "Other Health Impairment" as defined in 34 C.F.R. 300.8(c)(9). . (Woika R. 5.) However, Dr. Woika did not believe Devin needed special education because "it does not appear that D.J. was experiencing any difficulties related to educational performance." (Woika R. 5.) Dr. Woika looked at Devin's academic performance during first and second grades[9], his progress reports, and teacher comments, including Keisewetter's deposition. *Id.* Dr. Woika saw "no adverse affects [sic] on DJ's educational performance." (Woika R. 6.) She therefore concluded that the District's "child find" duty had not been activated. Even if the District had found that Devin's circumstances warranted a full evaluation, Dr. Woika believed it "unlikely that he would have qualified for an IEP as a student with an Other Health Impairment even if such an evaluation would have been undertaken." (Woika R. 6.)

Defendants' special education expert, Andrew M. Klein, agreed with Dr. Woika that a full evaluation was not warranted in Devin's case. Klein noted that "a review of Devin's educational records through second grade would not lead one to conclude that he was displaying

---

[9] No third grade report card had issued at the time of Devin's death.

learning and educational problems, which should have led the educators to consider even contemplating such a need on Devin's part." (Klein R. 4.) Like Dr. Woika, Klein observed "a lack of a discernable [sic] adverse affect [sic] on educational performance." (Klein R. 4.) Klein also concurred with Dr. Woika that even if Devin had undergone a full evaluation, "there is not a scintilla of information or evidence to be able to posit he would have required specially designed instruction by a certified special education teacher to be delivered via an IEP." (Klein R. 4.)

Defendants find it significant that Dr. Jeffrey M. Rosch, who assessed Devin's medical condition, declined to comment on the District's child find duty or Devin's eligibility for an IEP. (Defs.' Br. 8.) However, the Court finds it unremarkable that Dr. Rosch acknowledged that his expertise does not lie within the realm of special education.

Now realizing that Devin did not have an IEP, and arguing that he should have been identified as a child in need of an IEP, Taylor's IDEA claim depends entirely on Devin's academic performance. It is not disputed what Devin's grades were. (DSMF ¶ 84; PRSMF ¶ 84.) It is, however, disputed how good those grades were. (PRSMF ¶ 84.) Taylor points out that because D.J. ranked seventh out of twelve students, he is not accurately described as an "average" student. (PRSMF ¶ 84.) Taylor does not support her assertion in any fashion; she simply disagrees that seventh out of twelve is an average rank. However, Taylor's differing subjective interpretation of Devin's grades cannot transform them into a disputed fact. She must do more to establish a genuine issue of material fact at summary judgment. It is not enough to "simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The School Distrct, the moving party, has met its burden of producing affirmative evidence, in the form of Devin's grades, that Devin was not struggling academically such that the school should have been alerted to the

possible need for an IEP. In response, Taylor must produce "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). By merely voicing her disagreement on Devin's academic performance and pointing out that he was disruptive in second grade, Taylor falls short of the evidentiary threshold necessary to allow the IDEA claim to survive summary judgment. Because Taylor has failed to establish any genuine issues of material fact that the School District violated its "child find" duty, her IDEA claim must fail.

## B. REHAB ACT AND ADA CLAIMS

The Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.*, ("Rehab Act") prohibits recipients of federal funds from discriminating on the basis of disability. Specifically, § 504 of the Rehab Act provides as follows:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a). Similarly, the Americans with Disabilities Act (ADA) provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Both statutes "have been interpreted to apply to prevent students with disabilities from being denied a free appropriate public education by a school district." *J.L. ex rel. J.L. v. Ambridge Area School Dist.*, 622 F.Supp.2d 257, 272 (W.D. Pa. 2008). The ADA provides the same protections as § 504 only without regard to whether the "public entity" also receives federal funding. *Jeremy H. by Hunter*, 95 F.3d at 279. Taylor has an implied private right of action, through Congress' incorporation of Title VI's "rights, remedies, and procedures" into the Rehabilitation Act, to

enforce § 504. *Three Rivers Ctr. for Independent Living v. Housing Auth. of Pittsburgh*, 382 F.3d 412, 425-26 (3d Cir. 2004). The remedial scheme for a non-employment discrimination claim under the Rehab Act, as asserted by Taylor, is found in Title VI of the Civil Rights Act of 1964. 29 U.S.C. § 794a(a)(2). The ADA shares the Rehab Act's remedial scheme. 42 U.S.C. § 12133.

To meet its obligations under § 504, the recipient of federal funds "shall make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program or activity." 45 C.F.R. 84.12(a). In addition, Chapter 15 of the Pennsylvania Administrative Code implements § 504 of the Rehab Act throughout Pennsylvania school districts. 22 Pa. Code § 15.1(a). Section 15.3 provides that "[a] school district shall provide each protected handicapped student enrolled in the district . . . services or accommodations which are needed to afford the student equal opportunity to participate in and obtain the benefits of the school program and extracurricular activities without discrimination . . . ." The Chapter 15 regulations also set forth notice requirements for identifying protected children. 22 Pa. Code § 15.4.

To establish a prima facie case of a § 504 violation, Taylor must prove that (1) Devin was "disabled" as defined by the Act; (2) he is "otherwise qualified" to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school. *Ridgewood Bd. of Educ.v. N.E. ex rel. M.E.*, 172 F.3d 238, 253 (3d Cir. 1999). Taylor "need not establish that there has been an intent to discriminate in order to prevail under § 504." *Nathanson v. Med. College of Penn.*, 926 F.2d 1368, 1384 (3d Cir. 1991.) The School District

17

does not dispute that Devin is a "qualified individual" under both the Rehab Act and ADA. Nor does the School District dispute that it is a recipient of federal funds under the Rehab Act or a "public entity" for purposes of the ADA. It is only the discrimination element that the School District asserts cannot be met.

### 1. Relationship between Rehab Act/ADA claims and IDEA claim

In support of summary judgment on Plaintiff's Rehab Act and ADA claims, the School District relies in part on Taylor's failure to put forth facts sufficient for her IDEA claim. The Third Circuit has found "few differences, if any, between IDEA's affirmative duty and § 504's negative prohibition." *Ridgewood*, 172 F.3d at 253. "[A] school's failure to notify parents of its IDEA duties could violate § 504 . . . ." *Matula*, 67 F.3d at 501 n.13. An IDEA claim may bear certain similarities to claims brought under the Rehab Act and ADA, and "[i]f a plaintiff applies the same core facts supportive of the IDEA claim and it fails, the ADA and Rehabilitation Act claims must also fail." *Emily Z. v. Mt. Lebanon School Dist.*, Civil No. 06-442, 2007 WL 3174027 (W.D. Pa. 2007). Because in this case, the IDEA and Rehab Act/ADA claims do not share a similar factual foundation, the District's argument is without merit.

The School District's belief that dismissal of the IDEA claim necessitates dismissal of the Rehab Act and ADA claims is misplaced because on summary judgment it is obvious that the facts Taylor sets forth for the IDEA claim differ significantly from those she sets forth in support of the Rehab Act and ADA claims. As discussed previously, Taylor's IDEA claim is unusual in that Devin had no IEP, and her IDEA claim fails because the record contains insufficient evidence to support her contention that Devin should have had an IEP. On summary judgment Taylor has not argued the insufficiency of an IEP as part of her IDEA claim because Devin had no IEP. Taylor is, however, arguing the insufficiency of Devin's service plan, as he did indeed

have one. The core facts quite clearly differ between the IDEA claim and Rehab Act/ADA claims. The District seems to be looking solely at the Amended Complaint, in which Taylor does aver the same core set of facts in support of the IDEA, Rehab Act, and ADA claims. However, this matter is before the Court on summary judgment with a considerably more developed record that has significantly altered the IDEA claim. Holding Taylor to the core set of facts contained in her complaint not only confuses a motion for summary judgment with a motion to dismiss, it ignores the extensive record before the Court. The Court cannot, therefore, grant the School District summary judgment on the Rehab Act and ADA claims based on the failed IDEA claim.

## 2. Discrimination

The School District also argues that summary judgment is appropriate on the Rehab Act and ADA claims because Taylor is unable to establish that Devin was excluded from participation in, denied the benefit of, or subject to discrimination at school. Since, out of all the elements of a § 504 claim, the School District only focuses on the fourth and implicitly concedes that Taylor has met the first three (Defs.' Br. 13), the Court limits its discussion to the fourth element only.

Taylor asserts that the School District discriminated against Devin by not supplying him with a nebulizer and by not providing Devin with transportation. (Pl.'s Br. 11.) However, Taylor erroneously compares Devin's treatment to that of other disabled children, arguing that "other children within the district were provided with medical services such as nebulizers." (Pl.'s Br. 11.) The question is decidedly not, as Taylor puts it, "why other children with asthma received nebulizers from the district, but why D.J. . . . was not provided with similar services." (Pl.'s Br. 11.) It is immaterial what services other children with asthma, or indeed any other

19

condition, received. The Rehab Act and ADA protect individuals *with* disabilities from being denied the benefits of or participation in programs offered to individuals *without* disabilities, and the discrimination must have been based on the inidividual's disability. *See Eric H. ex rel. John H. v. Methacton School Dist.*, 265 F.Supp.2d 513, 522 (E.D. Pa. 2003) (comparing the benefits plaintiff student had been afforded with those given non-disabled students). Taylor's observation that other children with asthma received certain services may be relevant to establish that provision of those services to Devin would not have posed an "undue hardship" on the School District, but not to establish discrimination. The Rehab Act does not impose an obligation on schools "to meet [a student's] needs to assure that she has access to the same benefits that may be provided to other handicapped individuals, but rather the Act only mandates that services provided non-handicapped individuals not be denied [the student] because she was handicapped." *Landau v. Cheltenham School Dist.*, Civil No. 92-6590, 1993 WL 377104, at *5 (E.D. Pa. Sept. 21, 1993) (citing *P.C. v. McLaughlin*, 913 F.2d 1033, 1041 (2d Cir. 1990)).

Though she mistakenly compares Devin to similarly situated disabled students, Taylor is in fact simply arguing that the School District failed to provide Devin with a reasonable accommodation that denied him a free appropriate public education. The Amended Complaint, in fact, alleges that "DJ was deprived of a free and appropriate public education in an environment that accommodated his reasonable needs arising from the recognized disability, asthma." (Compl. ¶ 149.) "Normally, failure-to-accommodate claims are brought because a recipient of federal funding refuses or fails to provide reasonable accommodations to disabled persons." *Kaitlin C. ex rel. Shannon M. v. Cheltenham Twp. School Dist.*, Civil No. 07-2930, 2010 WL 786530, at *3. The Court finds Taylor's claim, as expressed in the Amended

Complaint, to be exactly that. The Court therefore views Taylor's Rehab and ADA claims as based on an alleged failure to provide reasonable accommodation.

The Court sees Taylor's Rehab Act and ADA claims as quite similar to the Rehab Act claim brought by the plaintiff in *Nathanson*. In that case, plaintiff Nathanson claimed that the Medical College of Pennsylvania (MCP) violated § 504 by refusing to provide her seating accommodations she needed because of her back and neck injuries. 926 F.2d at 1370. The Third Circuit reversed the district court's grant of summary judgment in favor of MCP because it found the following material facts remained disputed: "1) whether MCP had reason to know that Nathanson's condition was a handicap, and 2) whether MCP provided reasonable accommodations for Nathanson's handicap." 926 F.2d at 1370. Here, like MCP, the School District "'had the affirmative duty to investigate individual needs to determine what special or additional services would be needed and then to set about to provide those services.'" *Nathanson*, 926 F.2d at 1385 (quoting *David H. v. Spring Branch Indep. School Dist.*, 569 F. Supp. 1324, 1336 (S.D. Texas 1983)). Just as in *Nathanson*, material issues of fact persist in what constituted reasonable accommodations for Devin and whether the School District provided such reasonable accommodations.

The School District's entire approach to Taylor's Rehab Act and ADA claims is premised on a causation argument that does not find support within the relevant statutes or caselaw. Specifically, the District points out that Taylor cannot prove that any Rehab Act or ADA violation resulted in the harm to Devin on September 24, 2003. First, Defendants contend, there was a nebulizer at the school that day, and in any case a nebulizer cannot be administered to a patient who is not breathing. (Defs.' Br. 13-14 n.3.) Second, Devin was not walking to or from school when his asthma attack occurred, so Defendants observe the absence of a causal link

21

between Devin's death and the District's alleged failure to provide Devin with transportation. (Reply 2.) The Court is unable to find any reason for why a Rehab Act or ADA claim can only lie if a plaintiff can prove that the school's violation resulted in some harm independent of the violation. The School District cites no authority for this proposition. The Court finds it to be without merit.

Summary judgment is inappropriate on Taylor's claim of failure to accommodate in part because, while there is no dispute that Devin had a service plan in place, there are disputes about the adequacy of that service plan. *See Kaitlin C.*, 2010 WL 786530, at *3 (expressing some confusion over Plaintiffs' decision to proceed with a failure-to-accommodate claim where the adequacy of the student's IEP was *not* disputed). It is not clear whether the School District agrees that there is a dispute over the adequacy of Devin's service plan. The School District insists that Woika, Taylor's special education expert, "is unable to find any defect with the Service Plan" yet concedes that Woika questions its "comprehensiveness." (Defs.' Br. 13.) The record belies the notion that there is no dispute over the adequacy of Devin's service plan. The School District does not explicitly concede there is a dispute over the service plan's adequacy but rather views its adequacy as irrelevant absent a causal link to Devin's death. When all reasonable inferences are drawn in favor of Taylor, the School District's conduct does appear to support a failure-to-accommodate claim, thus precluding summary judgment.

Summary judgment is also inappropriate because it is disputed whether Devin's nebulizer was a reasonable accommodation that the School District failed to provide. (Pl.'s Br. 11.) The School District completely bypasses the failure-to-accommodate argument with respect to the nebulizer by pointing out that "[t]here was a nebulizer for Plaintiff-Decedent in the nurse's office." (DCSMF ¶ 75.) It is not disputed that there was a nebulizer at school, but this

22

undisputed fact is unresponsive to the alleged failure to accommodate. The question for purposes of the Rehab Act and ADA claims is whether the School District should have provided Devin with a nebulizer and, if so, whether it did in fact provide him with one. That question is quite obviously disputed. Taylor argues that she requested that the School District provide a nebulizer but ended up bringing one to the school herself when the school did not provide one. (RDCSMF ¶ 75.) She further alleges that during Devin's first and second grade years the school asked her to bring in Devin's nebulizer for him to use. (RDCSMF ¶ 75.) The School District, on the other hand, maintains that "[r]egardless of who supplied the nebulizer, the fact remains that there was a nebulizer at the School on September 24, 2003." (Reply 2.)

Taylor also argues that Devin should have been provided with transportation, and material issues of fact surround this allegation as well. Taylor makes an inapposite comparison by arguing that "the district provided transportation to other children with asthma but failed to provide the same service to D.J." (Pl.'s Br. 11.) The School District insists that the transportation issue does not "bear a relationship to September 24, 2003, incident, as there is no dispute that Plaintiff-Decedent was not walking to/from school when the incident occurred . . . ." (Reply 2.) The correct inquiry is whether Devin, by not having transportation provided, was denied a free appropriate public education that was enjoyed by non-disabled children. There remain material issues of fact on the question of transportation that preclude summary judgment.

Indeed, the School District's avoidance of the service plan's adequacy, the nebulizer, and transportation only serves to magnify the disputed facts regarding whether the School District met its legal obligations under the Rehab Act and ADA. Summary judgment is therefore inappropriate on these claims.

Because the Court finds Taylor's Rehab Act and ADA claims sufficient to withstand summary judgment, the Court need not at this point reach the question of whether compensatory damages are appropriate. However, the Court does note that while a § 504 claim need not allege intentional discrimination, there is a question as to whether compensatory damages are recoverable where the discrimination was unintentional. *See Kaitlin C.*, 2010 WL 786530, at *4-5 (finding that a plaintiff must allege discriminatory intent in a § 504 claim in order to recover compensatory damages).

## C. SECTION 1983 CLAIMS

Taylor has brought a Fourteenth Amendment substantive due process claim against both Defendants under the "state-created danger" theory of liability under § 1983. While Myers' conduct is the basis of Taylor's claim, Taylor argues the School District is also liable for its failure to train and for its policy, practice, or custom that endangered Devin.

### 1. State-Created Danger Theory of Liability

To prevail on a state-created danger theory, a plaintiff must establish the following four elements:

> (1) the harm ultimately caused was foreseeable and direct;
> (2) the state actor acted with a degree of culpability that shocks the conscience;[10]
> (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general;
> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

---

[10]  The Third Circuit adopted the state-created danger theory of substantive due process liability in *Kneipp v. Tedder*, 95.F.3d 1199, 1208 (3d Cir. 1996). Following *Kneipp*, the Supreme Court specified in *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998), that to satisfy the second element the plaintiff must show that the state actor's action "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense."

*Bright v. Westmoreland County*, 443 F.3d 276, 281 (3d Cir. 2006) (citations omitted) (internal quotation marks omitted). Taylor's state-created danger claim necessarily withstands summary judgment since it consists of the facts surrounding Devin's asthma attack, respiratory distress, and lapse into consciousness, which, as noted previously, are almost entirely disputed and undoubtedly material.

Defendants' position with regard to the first prong is not clear. Defendants merely advise the Court that it "does not have to accept 'bald assertions' or '[sic]legal conclusions contained in the complaint to [sic] as a basis for proving the first prong of the test." (Defs.' Br. 17.) This language seems to evoke a standard more pertinent to a motion to dismiss than a motion for summary judgment. In any case, Defendants have plainly not met their burden of showing an absence of disputed facts with regard to the first factor.

With regard to the second factor, before discussing the conscience-shocking conduct alleged, it is first necessary for the Court to determine what conduct would shock the conscience, and thereby satisfy the second prong of the state-created danger claim, in Myers' classroom the afternoon of September 24, 2003. What conduct shocks the conscience is determined by the given set of circumstances. "The exact degree of wrongfulness necessary to reach the conscience-shocking level depends upon the circumstances of a particular case." *Miller v. City of Phila.*, 174 F.3d 368, 375 (3d Cir. 1999).

The Third Circuit has articulated three standards of culpability for substantive due process violations. The lowest level of culpability is where the state actor has the luxury of "actual deliberation" and "unhurried judgments," in which case the state actor's "deliberate indifference" may shock the conscience. *Lewis*, 523 U.S. at 849-51. On the other end lies a situation where a state actor must act in a high-pressure situation, in which case a higher standard

25

of "intent to harm" would be required to shock the conscience. *Id.* at 854. "The level of culpability required to shock the conscience increases as the time state actors have to deliberate decreases." *Sanford v. Stiles*, 456 F.3d 298, 309 (3d Cir. 2006). A middle standard of culpability was first articulated in *Miller* as "gross negligence or arbitrariness" in the context of a social worker's decision to remove a mother's children from her care. *Miller*, 174 F.3d at 375-76. The intermediate standard "was created to apply to cases in which no immediate or split-second decision was required, but where officials nonetheless did not have the luxury of true deliberation." *Sanford*, 456 F.3d at 306. The Third Circuit in *Ziccardi v. City of Phila.*, 288 F.3d 57, 58-59 (3d Cir. 2002), identified a "new articulation for the mid-level standard first discussed in *Miller*." *Sanford*, 456 F.3d at 307 n.8. The circumstances in *Ziccardi* were such that the state actors did not have to make a split-second decision yet did not have the luxury of deliberation. This second mid-level standard of culpability is met when "defendant[] consciously disregarded, not just a substantial risk, but a *great* risk that serious harm would result." *Ziccardi*, 288 F.3d at 66.

The Court previously discussed the standards of culpability that would probably apply to these circumstances and viewed Devin's lapse into consciousness[11] as triggering a heightened level of culpability. *Taylor II*, 513 F.Supp.2d at 569. Assuming, as is appropriate on summary judgment, that Taylor's version of events is correct and that Myers told Devin he could not go to the nurse, the record reflects that that brief interaction did not take place in an environment that was either "hyperpressurized" or did not afford Myers the opportunity to deliberate. Indeed, not much deliberation is required for such a question. In *Miller*, by comparison, the decision facing

---

[11] While the Court specifically mentioned Devin's loss of consciousness in *Taylor II*, the Court has no intention of striking a distinction between Devin's lapse into unconsciousness and his inability to breathe. If Devin stopped breathing or evinced extreme respiratory distress before lapsing into consciousness, that too would trigger the heightened standard befitting such an emergency. It is just not clear from the record and the conflicting recollections precisely how the asthma attack was impacting Devin on a second-to-second basis.

the social worker was whether to remove children from their mother's home following an investigation into alleged abuse. 174 F.3d at 371. The Third Circuit in *Miller* noted that "a social worker acting to separate parent and child does not usually act in the hyperpressurized environment of a prison riot or a high-speed chase [but] rarely will have the luxury of proceeding in a deliberate fashion, as prison medical officials can." *Id.* at 375. The Court views Myers' refusal to allow Devin to go to the nurse (Taylor's version of events) as lacking signs of urgency or quick thinking that would require a heightened standard of culpability.

Once Devin stopped breathing, however, the atmosphere of the classroom understandably changed dramatically with the onset of a life-threatening emergency. In that environment, a culpability standard higher than that of deliberate indifference must be established to support a substantive due process violation. Courts that have applied the intermediate standard have done so where the state actor did not have the luxury of unrushed deliberation yet the situation could not properly be characterized as "hyperpressurized" like a prison riot or high-speed chase. *See Miller*, 174 F.3d at 375 (social worker making relatively quick decision but not in hyperpressurized environment). In contrast, in the context of a high-speed police chase, the Supreme Court in *Lewis* explained that since the officers acted "in haste, under pressure, and frequently without the luxury of a second chance," only the highest "intent to harm" standard of culpability would shock the conscience. 523 U.S. at 853.

Although it is difficult to imagine a situation marked by a greater sense of urgency than a child unable to breathe, on balance the Court determines that the intermediate standard of culpability should apply to Myers' actions starting from the moment the situation became life-threatening. Though Myers had seconds, not minutes, to think, it is not entirely true that she was unable to proceed in a deliberate fashion. Devin's service plan directs that 911 be called if Devin

27

is showing signs of respiratory distress. (Defs.' Ex. Y.) The Athsmatic Reaction Procedure states that "[w]hen symptoms increase in severity or there is absent breathing/pulse/decreased level of consciousness, delegate call to EMS/911, and begin CPR as necessary." (Defs.' Ex. Y.) Myers was aware of Devin's asthma. She received a copy of D.J.'s service plan before the start of the 2003-2004 school year. (Myers Dep. 16:6-9.) Adams met with her at least twice before the start of the school year and described to Myers what symptoms she should watch for. (DCSMF ¶ 98[12].) Myers was even aware that Devin had been life-flighted to Pittsburgh following an asthma attack during his second grade year. (Myers Dep. 14:9.) It is the fact that there was a plan in place to deal with just such an emergency with this particular student that, in the Court's view, distinguishes the emergency in Myers' classroom from the high-speed police chase. As a result, Myers' conduct from the moment when the situation escalated into a life-threatening situation must be found to "consciously disregard a great risk that harm would result" in order to shock the conscience.

Summary judgment is inappropriate on the fourth prong alone because the affirmative act that forms the basis of Taylor's claim is that Myers would not let Devin go to the nurse. This allegation is based on the testimony of T.T. Defendants insist they are entitled to summary judgment despite T.T.'s testimony because her recollections are at times internally inconsistent and contradicted by the testimony of other individuals. (Defs.' Br. 19-20.) However, the weaknesses Defendants perceive in T.T.'s testimony are properly the subject of cross-examination and cannot support summary judgment since it is not within the Court's purview to make determinations of witness credibility.

The Court notes that if the jury were to disbelieve the testimony of T.T. that Myers said "no" when Devin asked to go to the nurse, the state-created danger theory would fail because the

---

[12] See footnote 2.

affirmative act Taylor alleges is that Myers did not let Devin leave. Without an affirmative act, there cannot be a constitutional violation under a state-created danger theory of liability. *See Bright*, 443 F.3d at 282 ("[W]e have never found a state-created danger claim to be meritorious without an allegation and subsequent showing that state authority was affirmatively exercised.").

Therefore, Taylor's § 1983 claim against Myers survives summary judgment. Taylor's § 1983 claim against the School District, however, requires further analysis. In order for the School District to be held liable under § 1983, Taylor must "demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 404 (1985). To support her allegation that the School District was the "moving force" behind Devin's injuries, Taylor advances the theories of "policy, practice, or custom" and "failure to train."

### 2. Policy, Practice, or Custom Theory

In order to establish a municipality's liability for a constitutional deprivation, a plaintiff may show that the constitutional deprivation was caused by the municipality's officially or informally adopted policy, regulation, or decision. *Kneipp*, 95 F.3d at 1212. In the Amended Complaint, Taylor alleged that the School District had a "policy against children carrying prescription medication, or against self-administering such medication." (Compl. ¶ 217.) In *Taylor II*, the Court noted that it would be better able "to evaluate the applicability of the District's policy, and the effect that it may have had on the District's duties with respect to Devin, when the record is more fully developed." 513 F.Supp.2d at 576-77. The record now shows that the School District in fact had a policy specifically allowing "[e]lementary students, who are proficient in the use of their inhalers, [to] keep them in the classroom, the main office,

or the health room as negotiated between parent, school nurse and physician." (Defs.' Ex. R.) It now appears resolved that Taylor cannot prove the existence of the policy she previously alleged.

Taylor instead now points to Devin's Asthmatic Reaction Procedure (and its CPR instruction) as a policy and argues the School District violated Devin's constitutional rights by "withholding the very service [i.e. CPR] that they themselves recognized as inherent to asthmatic procedures." (Pl.'s Br. 19.) By arguing that the School District had a sound policy that it failed to follow, Taylor necessarily admits that she has no quarrel with the policy itself. She cannot therefore show that the School District, through its policy, was the "moving force" behind Devin's constitutional deprivation.

### 3. Failure to Train

In order to hold the School District liable on a "failure to train" theory, Taylor would have to "identify a failure to provide specific training" that caused the harm to Devin and "demonstrate that the absence of that specific training can reasonable be said to reflect deliberate indifference to whether the alleged constitutional deprivations occurred." *Reitz v. County of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997). This Court previously explained in *Taylor II* that in order to prevail on this claim, Taylor must show the School District's indifference to Devin's constitutional rights, not his medical needs. "A viable failure to train claim under § 1983 must rest on an allegation that a municipality or supervisor did not provide the training needed to prevent *constitutional violations*, not medical calamities." *Taylor II*, 513 F.Supp.2d at 576 n.15.

Taylor's arguments do not satisfy this subtle but constitutionally significant distinction. Taylor argues that the School District included a CPR instruction in the Asthmatic Reaction Procedure but "never trained the employees who interacted with D.J. on a daily basis to implement this plan." (Pl.'s Br. 20.) This argument fails for a couple of reasons. First, the

30

constitutional deprivation Taylor alleges is inextricably intertwined with Myers' alleged refusal to allow Devin to go to the nurse. If the School District failed to adequately train personnel in administering CPR, that failure lacks a causal nexus to Myers' preventing Devin from seeking help. Second, Taylor's allegations, if true, establish indifference at most, not *deliberate* indifference, to Devin's constitutional rights. If the District did in fact inadequately train personnel, its decision to do so would have to "reflect a deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Bd. of County Comm'rs of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 411 (1997). If the School District affirmatively prevented asthmatic children from having access to their inhalers, that policy may have triggered with the School District a duty to focus on CPR training since withholding asthma medicine conceivably could contribute to an asthmatic child needing CPR. Without the no-inhaler policy, however, there exists no causal nexus between the School District's alleged failure to train and Devin's constitutional deprivation. *See Taylor II*, 513 F.Supp.2d at 577 (refusing to dismiss Taylor's § 1983 claim against the School District because Taylor had alleged sufficient facts "to establish that the District's policy of prohibiting students from administering their own medications, coupled with the District's failure to train Myers as to Devin's constitutional rights, served as the *moving force* behind the alleged constitutional violation committed by Myers"). Although the adequacy of the School District's training may be relevant for other reasons in this case,[13] the record does not support a showing of deliberate indifference to Devin's *constitutional* rights.

---

[13] In light of the School District's decision to implement an Asthmatic Reaction Procedure, the adequacy of training that would allow teachers to respond properly to an asthma attack could prove relevant to Taylor's Rehab Act and ADA claims by helping to establish an intent to discriminate.

#### 4. Punitive Damages against Myers

Taylor also seeks punitive damages against Myers, which may be awarded "to punish [the defendant] for [her] outrageous conduct and to deter [her] and others like [her] from similar conduct in the future." *Smith v. Wade*, 461 U.S. 30, 54 (1983). As is apparent from the above discussion, Myers' conduct in the classroom on September 24, 2003, is fraught with dispute. Therefore, the Court is unable to determine as a matter of law whether her conduct reaches the "outrageous" threshold articulated by the Supreme Court in *Smith*. The question of whether that standard was met is a factfinding one that precludes summary judgment on Taylor's punitive damages claim.

### VI. CONCLUSION

For the reasons set forth above, Taylor's IDEA claim and § 1983 claim against the School District will be dismissed. Genuine issues of material fact do exist with respect to the Rehab Act and ADA claims against the School District and the § 1983 claim against Myers. Therefore, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 74) is **GRANTED IN PART** and **DENIED IN PART**.

**BY THE COURT:**

September 3, 2010

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**